**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Joshua Figuli, David Figuli,

Education Equities LLC,

Hussian College,

**Plaintiffs,**

v.

Jeremiah Staropoli, Steve Wojslaw,

Eric Heller, Ronald Lelley,

Velocity Capital Group LLC, Summit Capital Funding LLC,

**Defendants.**

**Civil Action No. 24-cv-05408**

## DEFENDANT JEREMIAH STAROPOLI'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

AND NOW COMES Defendant Jeremiah Staropoli, respectfully submits this Motion to Compel Arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, and to stay or dismiss the proceedings pending the outcome of arbitration. In support thereof, Defendant states as follows:

### I. INTRODUCTION

1. Plaintiffs bring claims that are subject to a valid and enforceable arbitration agreement between the parties. The agreement explicitly requires the resolution of disputes arising under or related to it through binding arbitration. A copy of the agreement is attached hereto as Exhibit A.
2. Moreover, a prior arbitration judgment involving co-defendant Steve Wojslaw and Plaintiff Hussian College demonstrates Plaintiffs' acknowledgment of arbitration as the appropriate forum for disputes of this nature. A copy of that judgment is attached hereto as Exhibit B.

### II. ARGUMENT

A. **The Federal Arbitration Act Requires Enforcement of Arbitration Agreements**

3. The FAA, 9 U.S.C. § 2, provides that arbitration agreements in contracts involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
4. Courts have consistently emphasized that the FAA reflects a strong federal policy favoring arbitration. See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983).
5. Arbitration agreements are to be enforced rigorously according to their terms. See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985).
6. The FAA preempts state laws and doctrines that might otherwise invalidate arbitration agreements. See AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 341 (2011).

**B. A Valid Arbitration Agreement Exists**

7. The two-step framework for determining whether to compel arbitration requires courts to assess:
   a. a. Whether a valid agreement to arbitrate exists; and
   b. b. Whether the dispute falls within the scope of the arbitration clause. See Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019); John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d 132, 137 (3d Cir. 1998).
8. In this case, the arbitration clause in Exhibit A is valid and enforceable. It governs all disputes arising out of or relating to the agreement, which includes the claims asserted in this action.

**C. The Dispute Falls Within the Scope of the Arbitration Clause**

9. Arbitration clauses should be construed broadly, and any doubts concerning arbitrability must be resolved in favor of arbitration. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); Lamps Plus, Inc. v. Varela, 139 S. Ct. 1407, 1418 (2019).
10. Plaintiffs' claims arise directly from the contractual relationship between the parties, placing the claims squarely within the scope of the arbitration clause.

**D. Case Law Strongly Favors Compelling Arbitration**

11. The Supreme Court has repeatedly held that arbitration is a matter of contract and must be enforced according to its terms. See Epic Systems Corp. v. Lewis, 138 S. Ct. 1612, 1621 (2018); American Express Co. v. Italian Colors Restaurant, 570 U.S. 228, 233 (2013).
12. The Third Circuit has similarly upheld the enforcement of arbitration clauses, emphasizing that parties are bound to their agreements. See Puleo v. Chase Bank USA, N.A., 605 F.3d 172, 177–78 (3d Cir. 2010).
13. Even challenges to the enforceability of the agreement as a whole must be resolved by the arbitrator, not the court, when the arbitration clause itself is not specifically challenged. See Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445–46 (2006).

**E. This Court is Obligated to Stay or Dismiss Proceedings Pending Arbitration**

14. Section 3 of the FAA mandates that judicial proceedings be stayed where the issues in the case are referable to arbitration. See 9 U.S.C. § 3.

15. Dismissal is also appropriate where all claims are subject to arbitration, as this avoids unnecessary judicial intervention. See Blair v. Scott Specialty Gases, 283 F.3d 595, 600 (3d Cir. 2002); Lloyd v. HOVENSA, LLC, 369 F.3d 263, 269–70 (3d Cir. 2004).

### F. Prior Arbitration Judgment Supports Enforcing the Agreement

16. Plaintiffs' involvement in prior arbitration proceedings, such as the matter involving co-defendant Steve Wojslaw (attached as Exhibit B), reflects their acknowledgment of arbitration as the appropriate forum for disputes of this nature.
17. This precedent further underscores the validity and enforceability of the arbitration agreement at issue in this case.

## III. CONCLUSION

WHEREFORE, Defendant Jeremiah Staropoli respectfully requests that this Honorable Court:

1. Compel Plaintiffs to submit all claims in this action to arbitration pursuant to the parties' agreement;
2. Stay all proceedings in this matter pending the completion of arbitration, or, in the alternative, dismiss the Complaint in its entirety; and
3. Grant such further relief as the Court deems just and proper.

**Respectfully submitted,**

*Sworn and Subscribed before me 1/8/25*

Jeremiah Staropoli

680 Christina Drive

Apt 304

Wellington, FL 3341

Jeremiah@keelingconsulting.com

Sarah Herrera
Notary Public
State of Florida
Comm# HH118452
Expires 4/18/2025

FLORIDA NOTARY ASSOCIATION SINCE 1976

Jeremiah Staropoli
680 Christina Dr
Apt 304
Wellington, FL 33414
Jeremiah Staropoli

### EXHIBITS

**Exhibit A:** Copy of the Agreement containing the arbitration clause.

**Exhibit B:** Arbitration judgment involving co-defendant Steve Wojslaw and Plaintiff Hussian College.

REC'D JAN 1 0 2025

# EXHIBIT A



# EXECUTIVE EMPLOYMENT AGREEMENT

*by and between*

## HUSSIAN COLLEGE, INC.

*and*

## JEREMIAH STAROPOLI

 

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** ("Agreement") is made and entered as of the 1st day of January, 2019 (*"Effective Date"*), by and between Hussian College, Inc. with its principal location at 1500 Spring Garden Road, Suite 101, Philadelphia, Pennsylvania (*"Hussian"*) (*"Employer"*) and Jeremiah Staropoli, whose Social Security Number is 222543363 (*"Employee"*).

**WHEREAS,** Employer is desirous of employing the Employee after the Effective Date pursuant to the terms and conditions and for the consideration set forth in this Agreement to perform services for and on behalf of Employer; and

**WHEREAS,** Employee is desirous of engaging full-time, exclusive employment with the Employer after the Effective Date pursuant to such terms and conditions and for such consideration;

**NOW, THEREFORE,** in consideration of the promises and the mutual covenants and agreements herein contained, the parties hereto agree as follows:

**1.** *Period of Employment.* In exchange for the Compensation described in this Agreement, and upon such other terms and conditions hereinafter set forth, Employer agrees to employ Employee for an indefinite term to serve at the pleasure of the Board of Directors and the Shareholders.

**2.** *Position and Responsibilities.* Employee will be the President of the College ("President") for Hussian College ("College"), a division of Hussian College, Inc. The duties and responsibilities of the President of the College shall be (i) those set forth in Exhibit A, attached hereto and made a part hereof, (ii) those as may established by the governing bodies of Employer from time to time, and, (iii) except as limited and restricted by (i) and (ii), those that are generally defined in the higher education industry, and particularly, as related to the operation and administration of accredited, Title IV colleges and institutions of higher education, as being attendant to the role of a president of a college. The position will report to the President of the Corporation and the Chairman of the Board. The activities of the Employee set forth on Exhibit B are deemed to be approved activities so long as the Employee's engagement therein does not interfere with his primary obligations to Employer.

**3.** *Compensation.* In exchange for the performance of his duties hereunder and all other services rendered by Employee in any capacity, Employer agrees to provide

Employee with the compensation specified in this Section. Employee will be responsible for the personal tax impact of the compensation provided under this Agreement.

   **a. Base Salary.** In exchange for the full and faithful performance of his duties hereunder and all other services rendered by Employee in any capacity to Employer, the Employee shall receive an annual base salary of Two Hundred and Twenty-five Thousand Dollars ($225,000) (*"Base Salary"*). The Base Salary shall be paid in equal monthly installments and pro-rated for any partial months and shall be subject to payroll withholdings and deductions as required by law, Employer policy, or Employee authorizations. Provided that the Employee is still employed by the Employer as of each succeeding January 1, the Base Salary shall be increased by Twenty-five Thousand Dollars ($25,000) on each and every such successive anniversary date).

   **b. Bonus Compensation.** Employee shall be eligible to receive an annual bonus award of up to fifty percent (_50%) of his Base Salary ("Bonus Award"). This annual bonus award will be based upon an assessment by the Board of Directors of Employee's level of achievement of performance goals during the measuring period for such performance goals. The performance goals shall be established by the Board of Directors at the beginning of each measuring period after consultation with Employee. Any Bonus Award earned will be paid in a lump sum no later than the ninetieth (90th) calendar day from and after the end of the related measuring period. The determination of the performance goals and the level of achievement of those goals by the Employee shall be made in the sole discretion of the Board of Directors upon the recommendation of the Chairman.

   **c. Incentive Equity Units.** Upon the later to occur of (i) the Effective Date of this Agreement, and (ii) the date that Daniel Pianko is removed as a unit holder of Education Equities Fund, LLC ("EEF"), EEF shall grant Employee incentive equity units equal to seven and one-half percent (7.5%) of the then-current equity holdings of EEF (the "Granted Units"). Such grant shall be pursuant to the terms of EEF's Equity Incentive Plan, an Award Agreement and EEF's Operating Agreement as same shall exist on the date of the issuance of the Grant. On issuance, 100% of the Granted Units shall be subject to forfeiture, however, so long as this Agreement has not been terminated and Executive is employed by EEF under the terms of this Agreement or a successor agreement incorporating this provision, then the Profit Units shall vest and be released from this right to forfeiture as follows:
(i) upon the date of the Grant, one-third of the Granted Units shall vest and be

released from the right of forfeiture; and

(ii) upon each of the first five (5) successive anniversary dates of the Effective Date of this Agreement one-seventh (1/7th) of the Granted Units shall vest and be released from the right of forfeiture. The Granted Units shall have Economic Interests only.

**d. Benefits**. During the Term, Employer shall provide to Employee the following benefits, which shall be wholly funded by Employer:

(i) Twenty (20) workdays of personal time off leave to be used for any reason that Employee sees fit ("*PTO Leave*"). The annual PTO Leave accrual maxima shall accrue on a pro-rated basis at the end of each calendar month of Employee's employment with Employer. Employee may carry over from one calendar year to the next up to ten (10) workdays of accrued and unused PTO Leave up to a total year-over-year accrual of no more than thirty (30) days. Upon reaching the maximum accrual, further accrual will be abated. Accrued and unused PTO Leave is not redeemable for compensation payment; if it is not used it is voided. Employee shall be credited a PTO Leave accrual as of the Effective Date of any unused vacation leave carried-over from his prior position with Employer.

(ii) Six (6) work days per year of short-term disability (sick) leave to be used only for a condition, whether physical or mental, that disables Employee from performing his assigned duties or which imposes a risk of infection to other employees ("*Sick Leave*"). Employer reserves the right to request a medical evaluation of Employee for any use of Sick Leave that exceeds five (5) consecutive days. The annual Sick Leave accrual maxima shall accrue on a pro-rated basis at the end of each calendar month and may be accumulated up to a maximum of six (6) work days. Accrued and unused Sick Leave is not redeemable for compensation payment; if it is not used it is voided.

(iii) Health and wellness insurance benefits equivalent to those provided to other employees of the Employer as established and revised by Employer from time to time.

(iv) Time off for all holidays observed by the Employer without loss of compensation.

(v) Time in service under this Agreement will be applied toward any vesting period for the purpose of any equity or incentive compensation arrangements.

**4. *Termination of Employment.*** The Period of Employment shall end (and the employment of Employee by the Employer shall terminate), on the first to occur of the following events (each a "Termination Event"):

**a. Death.** In the event of Employee's death prior to the end of the Period of Employment, this Agreement shall terminate as of the last day of the month of his death.

**b. Disability.** In the event of a Disability (as hereinafter defined) of the Employee during the Employee's employment hereunder, Employer shall have the right to terminate the Employee's employment thirty (30) days after written notice to the Employee (or the Employee's spouse or guardian). For purpose of this Agreement, the term "Disability" means any disability as defined under Employer's applicable disability insurance policy pertaining to the Employee or, if no such policy is applicable, any physical or mental disability or incapacity that renders the Employee incapable of performing the essential functions required of the Employee hereunder with or without reasonable accommodation in accordance with the provisions of the Americans With Disabilities Act (regardless of whether or not the ADA applies to the Employee's employment hereunder) for a period of ninety (90) days or for shorter periods aggregating to one hundred twenty (120) days during any consecutive twelve (12) months of the Employee's employment hereunder. If a disagreement arises between the Employee and Employer as to whether the Employee is suffering from a Disability, such issue will be determined by a physician designated by Employer. If the Employee disagrees with the conclusion of such physician then the Employee, at the Employee's expense, may obtain an opinion of a physician of the Employee's selection. If in the event of a disagreement between the conclusions of the physicians, a third physician (who is mutually agreed upon by Employer and Employee) shall be engaged to render an opinion, which opinion shall be final and binding on both parties. In the event of a Disability, the Base Salary otherwise payable hereunder will be offset by any long-term disability insurance program payments and paid through the end of the Period of Employment in monthly installments as specified in Section 3.a. as so reduced.

**c. For Cause.** In the event of (i) Employee's unauthorized and willful transfer or disclosure of any Employer information or other violation of the non-

competition, non-solicitation, non-conversion or non-disclosure obligations of this Agreement, (ii) disparagement of Employer or any of its Affiliates, as defined herein, in a fashion clearly and demonstrably injurious to Employer and its economic interests, (iii) commission of an act of dishonesty or breach of trust (A) in seeking this employment relationship with Employer, (B) prior to the Effective Date that may impair or call into question Employee or Employer's ability to lawfully or properly administer federal student aid programs, or (C) during the course of Employee's duties with Employer, (iv) Employee's serious, willful misconduct with respect to his duties under this Agreement, including but not limited to, conviction of a felony, (v) perpetration of a common law fraud which has resulted or is likely to result in material economic damage to Employer, or (vi) Employee's violation of other recognized standards of employment or conduct that constitute good cause for termination of an employee, such actions shall be grounds for termination for cause ("*For Cause*"). Upon a determination of the existence of For Cause circumstances relating to Employee, this Agreement shall terminate as of the date of such determination with no further obligations of Employer hereunder to Employee except for the obligation of Employer to pay to Employee any earned but unpaid Base Salary accrued to the date of termination subject to offset for any amounts owed by the Employee to Employer and any damages caused to the Employer as a consequence of the actions which constituted the For Cause determination.

**d. Without Cause.** Termination Without Cause means termination by Employer of Employee's employment other than due to Death, Disability, or For Cause. Upon termination of this Agreement Without Cause, Employee shall receive the benefits specified in Section 3.c. up to the date of employment termination in accordance with the provisions of such benefit plans and the Base Salary for a period of twelve (12) weeks after the date of termination. 

**e. Voluntary Resignation.** "Voluntary Resignation" shall mean Employee's voluntary termination of this Agreement for any reason other than Death, Disability, or For Cause. In order to invoke Voluntary Resignation benefits and protections set forth in this Section 4.e., Employee shall be required to provide Employer written notice of his intent to resign no less than forty-five (45) days prior to the effective date of his employment termination; provided that Employer may shorten the notice period and effect the termination of employment as of such date within the notice period as it shall in its sole discretion determine. Employee shall receive benefits specified in Section 3. C. up to the date of employment termination in accordance with the provisions of such benefit plans and the Base Salary through the effective date of the

Case ID: 240900122

Voluntary Resignation.

**5. *Non-Competition.*** Notwithstanding any of the terms or conditions herein, and in consideration of the employment of Employee and the mutual promises herein contained, Employee agrees that during the Period of Employment and for a period of six (6) months following the expiration or termination for whatever reason of the Period of Employment, Employee will not, directly or indirectly, on Employee's own behalf or for or with others, (i) in the State of Pennsylvania, (ii) in the territory circumscribed by a circle that is one hundred (100) miles from the City Hall in Philadelphia, Pennsylvania, or (iii) any other Metropolitan Statistical Area in which Employer or any of its affiliates is then offering services or seeking to obtain students or customers (as defined below); directly or indirectly own an interest in, be employed by or consult with, any entity competing directly or indirectly with Employer or any entity under common control with Employer (an "Affiliate"); nor will Employee otherwise compete, directly or indirectly, with any programs or services marketed or offered by Employer, regardless of location. Further, the Employee shall not during the Period of Employment or anytime thereafter seek to convert or divert, directly or indirectly, business opportunities, ideas, strategies or efforts to his benefit of that of another person or entity. The non-competition provision of this Section 5 will not apply if, and only if, Employee's termination results from the insolvency of Employer or Employer's cessation of operations.

**6. *Agreement Not to Solicit Customers or Employees.*** For purposes of this Agreement, the term "Customers" means all of Employer's or any Affiliate's clients, partners and students, whether or not Employee is Employer's or an Affiliate's primary contact person for any such Customer during his employment with Employer, whether such Customers were contacts or customers of Employee prior to the commencement of Employee's employment with Employer, are existing Customers Employer when Employee's employment with Employer commences and are specifically assigned to Employee, or become Employer's Customers after the commencement of Employee's employment with Employer and their business is obtained by Employee.

The term "Employees" shall mean all persons employed by Employer and any persons employed by Affiliates, whether such persons were employed at the date of this Agreement or subsequently became employed by Employer or its affiliates after that date. Upon and after the termination of Employee's employment with Employer, whether such termination is pursuant to the terms of this Agreement, upon expiration of this Agreement or otherwise, the following provisions shall apply with respect to the Customers and Employees: (i) within thirty (30) days after the termination of Employee's employment with Employer, whether such termination is pursuant to the

terms of this Agreement, expiration of this Agreement or otherwise, Employee shall, at the request of Employer, personally introduce a person designated in writing by Employer to all Customers with whom Employee has had contact and Employee shall introduce such person to such Customers as their new Employer contact person; (ii) Employee shall not, for a period of two (2) years following the termination of Employee's employment with Employer, whether such termination is pursuant to the terms of this Agreement, expiration of this Agreement or otherwise, contact or solicit the Customers or the Employees in contravention of this Agreement, or employ or assist others in employing the Employees, for any purpose whatsoever, except as otherwise provided in clause (i) above with respect to Customers and except that Employee may contact employees of Employer for purely social reasons provided that the discussion does not relate to business matters and does not include a solicitation of such employees in violation of this Section. Nothing in this Section shall prevent Employee from responding to contact initiated by Employees for the purpose of providing assistance to Employer in Employer's best interest.

7. **Non-Disclosure.** During the Period of Employment and for a period of two (2) years following the expiration of the Period of Employment or the termination of this Agreement, Employee agrees not to disclose to any third person, except for disclosures that may be required by law, any information about Employer or any Affiliates, their customers, plans, prospects, shareholders, directors, parents, employees, relationships, partners, students, programs, operations, or practices, except for such information as may be available to members of the public generally other than as a result of Employee's breach of this provision. Upon expiration of the Period of Employment or the termination of this Agreement, Employee shall immediately surrender to Employer all information concerning the Employer, its affiliates, directors, shareholders, parents, in his possession or control, of whatsoever kind or nature, including, without limitation, papers, documents, writings, computer hardware, software and files, computer disks and CD-ROMs, graphs, forms, files, notes, memoranda, correspondence, records and any other property produced by Employee or coming into Employee's possession as a consequence of Employee's employment with Employer.

8. **Assignment.** Employer shall have the right to assign this Agreement to an Affiliate or subsidiary corporation, specifically including an Affiliate created in a reorganization or an affiliation with another educational institution, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by or against its successors and assigns, provided that any such assignment by Employer shall not expand the scope of the non-competition obligations under Section 5 of this Agreement.

This Agreement provides for the personal services of Employee. Employee shall not

have the right to assign or transfer any of the rights or benefits hereunder, nor shall they be subject to voluntary or involuntary alienation.

**9.** *Amendment. Modification, Termination or Waiver.* The parties hereby irrevocably agree that no attempted amendment, modification, restatement, or change (collectively, *"Amendment"*) of this Agreement shall be valid and effective, unless the parties shall unanimously agree in writing to such Amendment. No waiver of any provision of this Agreement shall be effective unless it is in writing and signed by the party against whom it is asserted, and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver.

**10.** *Change in Taxation.* If subsequent to the Effective Date of this Agreement there occurs a change in the tax laws, regulations or administrative interpretations which would materially impact the taxation of the benefits provided to Employee hereunder, either party to this Agreement may propose an amendment. Any such proposed amendment shall be subject to this Section 10.

**11.** *Withholding and Offset.* Employer shall have the right to withhold and offset from any and all payments required to be made to Employee pursuant to this Agreement all federal, state, local, and/or other taxes which Employer determines are required to be withheld in accordance with applicable statutes or regulations as well as any amounts owed by Employee to Employer.

**12.** *Severability.* Should any part of this Agreement be declared invalid for any reason, such invalidity shall not affect the validity of any remaining portion hereof, and such remaining portions shall continue in full force and effect as if this Agreement had been originally executed without including the invalid part. If in any judicial proceeding the court refuses to enforce any of the covenants contained in Sections 5, 6 or 7 hereof because the time limit is too long, it is expressly understood and agreed between the parties hereto that for purposes of such proceedings, such time limitations shall be deemed reduced to the extent necessary to permit enforcement of such covenants. If in any judicial proceeding the court shall refuse to enforce the separate covenants contained in Sections 5, 6, or 7 because they are more extensive (whether as to geographic area, scope of business or otherwise) than necessary to protect confidential, proprietary or other information, business and/or goodwill of Employer, it is expressly understood and agreed between the parties hereto that for purposes of such proceeding, the geographic area, scope of business or other aspect thereof shall be deemed reduced to the extent necessary to permit such enforcement of such covenants.

**13. *Survival.*** Termination of this Agreement shall not deprive the parties hereto of any rights or release them of any liabilities or obligations which under the terms and provisions of this Agreement are to survive such termination, including by way of example, and not limitation, the rights and obligations set forth in Sections 5, 6, or 7 of this Agreement. Furthermore, the obligations of Employee under this Agreement shall continue in the event that Employee continues in the employ of Employer other than under the terms of this Agreement.

**14. *Dispute Resolution.*** Should any controversy, dispute or claim arise between Employer and Employee relating to or arising out of the subject matter of this Agreement, the relationship established hereby, or any provision of this Agreement (including termination of employment), the relationship of Employer and Employee or under any federal, state or local law or ordinance (including, but not limited to, claims, demands or actions under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and all amendments to the aforementioned, as well as any other federal, state or local statute or regulation regarding employment discrimination), such controversy, dispute or claim shall be settled exclusively by arbitration administered in Philadelphia, Pennsylvania by the American Arbitration Association in accordance with its applicable rules as modified to allow reasonable discovery as provided for in the Federal Rules of Civil Procedure at the request of either party. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction to enforce arbitration awards. The prevailing party in the arbitration shall, in addition to such other relief as may be granted, be entitled to a reasonable sum as and for such party's costs and expenses incurred, including attorney's fees. Employer and Employee each agree that, except for Employer's right to injunctive relief pursuant to Section 15 below, arbitration shall be the sole and exclusive remedy in the event any such controversy, dispute or claim shall arise.

**15. *Injunctive Relief.*** Employee hereby represents and acknowledges that she has special, exceptional and unique knowledge and skills, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately valued. Employee therefore agrees that Employer shall have the right, apart from the dispute resolution provisions of Section 14 and in addition to any other right which Employer may possess, (a) to enjoin him by appropriate legal action from violating the non-competition, non-solicitation and non-disclosure provisions of this Agreement, and (b) to specifically enforce Employee's obligations thereunder, during the Period of Employment and during the extended term of applicability of those provisions.

**16. *Work for Hire.*** The parties intend that all work performed by Employee for

Employer or any Employer Affiliate under this Agreement, or which was performed by Employee for the Employer or an Affiliate prior to the Effective Date which results or resulted in the creation, development or formulation of curriculum, marketing plans, conventions, inventions or any other tangible and intangible work, intellectual property, invention or other thing of commercial value ("*Intellectual Property*"), including, but not limited to, any such items developed by Employee for Employer or and Affiliate without using any Employer resources including, but not limited to equipment, other employees and/or information, shall be work for hire and Employer shall be the sole owner of such work during and at the conclusion of Employee's employment. The parties further agree that any other Intellectual Property developed by Employee for Employer or an Affiliate during the Period of Employment under this Agreement shall be sole and exclusive property of Employer or such Affiliate, including but not limited to Employer's rights with respect to applications for letters patent, filing of inventor's certificates, copyright registrations, or other intellectual property protection. Employee agrees to cooperate with Employer, at its request and at its expense, in filing applications and prosecuting any copyright, trademark or patent relating to the work.

To the extent any Intellectual Property is adjudged in accordance with Section 14 or other jurisdictional adjudicator to not constitute work for hire, Employee hereby agrees to assign all such Intellectual Property to Employer or Employer's designee. Employee further agrees to sign all instruments of transfer and any documents related to the registration of Intellectual Property to secure Employer or any Employer designee's rights under any applicable law of any state, the United States, or any foreign jurisdiction.

To the extent permissible under the law of any state, the United States, or any foreign jurisdiction, Employee hereby appoints Employer as its attorney-in-fact with all power and authority to effectuate employer's rights under this Section 16.

   **17.** *Exclusivity.* During the Period of Employment Employee shall not serve, either directly or indirectly, in any employment or advisory capacity or engage in any employment or management activities for any other person, firm, or corporation without the prior written consent of Employer, provided that the activities listed on Exhibit B, attached hereto, as presently constituted, are approved by Employer for continued pursuit or participation by Employee as being exempt from the provisions of this Section 17.

   **18.** *Entire Agreement.* This Agreement sets forth all the promises, covenants, agreements, conditions and understandings between the parties hereto with regard to

its subject matter and supersedes all prior and contemporaneous agreements, understandings, inducements or conditions expressed or implied, oral or written, except as herein contained. This Agreement expressly and specifically supersedes and annuls any prior or other employment, compensation, benefit or other agreement, of whatsoever kind or nature between Employee and Hussian no matter whether specifically identified, or whether known or unknown.

**19.** *Acknowledgement.* Employee acknowledges that she has carefully read this entire Agreement and has had the opportunity to seek and obtain, and has sought and obtained such advice and counsel as to its terms and provisions and his obligations, commitments, covenants and agreements hereunder. Employee acknowledges that his execution of this Agreement constitutes his free and voluntarily act and is without coercion or restraint of any kind or nature.

**20.** *Governing Law.* This Agreement and all disputes arising hereunder shall be governed by the laws of the State of Delaware.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

 

JEREMIAH STAROPOLI

_[signature]_

---

HUSSIAN COLLEGE, INC.

By: _[signature]_

President of the Corporation

As to the Incentive Equity Unit Grants:

EDUCATION EQUITIES FUND, LLC

By: _[signature]_

Its Authorized Representative

# EXHIBIT A

## *Position Duties and Responsibilities*

All capitalized terms in this Exhibit A shall have the meanings ascribed in that certain Employment Agreement entered into by and between Hussian College, Inc. and Jeremiah Staropoli, effective as of January 1, 2019.

The President's responsibility is to provide leadership that will enhance institutional growth, stability, and excellence. Within the framework of the policies of the Board of Directors and the Board's power of superintendence and preemption, the President has the authority and obligation to exercise such powers and perform such duties and responsibilities as may be necessary and appropriate for the proper management of College. The principal duties of the President are:

1. To recommend strategic objectives for the College and a plan for their achievement.

2. To exercise supervision and direction necessary to promote the efficient and cost effective operation of the College.

3. To act as the official medium of communication between all groups within the College, the corporate officers and the Board of Directors.

4. To report on a regular basis to the Board of Directors concerning the condition, needs, and general state of the College.

5. To prepare and present the annual budget of the College to the Board of Directors and to prepare and present no less than monthly the operating results under the annual budget.

6. To appoint committees and councils considered necessary in the performance of administrative duties.

7. To recommend candidates for conferral of diplomas, degrees and educational credentials who have satisfied the requirements for such credentials.

8. To make recommendations and decisions relative to the proper administration of all aspects of College operations not reserved to the shareholder of Hussian College,

Inc. ("Shareholders"), corporate officers or the Board of Directors.

9. To provide annual, formal evaluations of all staff and faculty.

10. To implement and monitor comprehensive and strategic long-range planning involving all sectors of the College.

11. To represent the College to the public.

12. To aid and promote programs designed to increase public relations and visibility of the institution.

13. To support the members of the Board of Directors, the corporate officers and the Shareholders.

14. To serve in an ex officio capacity as a member of all College administrative, faculty and staff councils and committees.

15. To serve as the official College liaison with all accreditation, licensing and other regulatory agencies to which the College is affiliated or by which it is approved.

16. To serve as chief spokesperson of the College.

17. To prepare and maintain a complete and current codification of all policies, rules and procedures of the College.

18. To effectively implement strategies and tactics to maintain the financial condition of the College in a profitable condition and to generate financial returns that are consistent with Board directives and financial plans.

19. To sign all contracts of the College that are properly approved, unless otherwise provided.

20. To maintain compliance with all laws, regulations and policies applicable to the operation of the College.

21. To maintain the books and records, including the financial records of the College in accordance with generally accepted standards and principles.

22. To ensure that the assets of the College are properly secured against loss.

23. To hire and fire all employees under the supervision and control of the President

with proper consultation with the corporate officers and the Board of Directors.

24. To perform other duties as requested by the corporate officers or the Board of Directors.

# EXHIBIT B

*Approved Activities*

*Confidential Personnel Record*

**Professional Development**
- *Prepare and publish in an independent media outlet no less than one article concerning college management.*

**Personnel**
- *Reorganize, restructure and replace as necessary the positions and staff of the College so as to build an effective and responsive organization that is dedicated to the mission and strategic outcomes of the College with a principal focus on superior student outcomes.*
- *Within the first ninety (90) days of 2019 conduct, or cause to be conducted, an evaluation of each staff member and cause to be conducted an evaluation of each faculty member and report findings to the Board.*

**Student Outcomes**
- *Achieve a student placement rate of 76% or higher and implement the use of a third party for verification of employment to meet the requirements of ACCSC.*
- *Achieve an average term-to-term student persistence rate of 95% with a focus on right-fit students.*
- *Maintain a student satisfaction rate across all categories of 90%.*

**Academic**
- *Perform a reassessment of all acquired curriculum and update said curriculum to comport with employer needs and competency assuring delivery methodologies.*
- *Add majors to acquired business degrees at acquired campuses including web development, cyber security, UI/UX, and supply chain management.*
- *Obtain NC-SARA approval for acquired online division and migrate programs online.*
- *Obtain approvals to bring acquired and updated programs to Philadelphia and Los Angeles campuses.*
- *Commence development of programs in advanced cyber security, financial technology, marketing technology, nursing and dental hygiene for implementation in 2020. Nursing and dental hygiene would be offered at least one campus beginning in 2020. All other programs would be offered at all campuses beginning in 2020.*
- *Prepare regulatory and accreditation filings for all of the above, as appropriate, and submit as necessary.*

**Technology Systems**
- *Develop and maintain effective implementation of a technology plan that will meet the needs of the College and its affiliates with a primary focus on cloud based solutions.*



**Financial**
- *Achieve or exceed budgeted enrollment, revenue and EBIDTA targets.*

**Facilities**
- *Institute campus improvement plan for Philadelphia in 2019 and prepare plans for acquired campuses for 2020.*
- *Launch an initial offering of Hussian College controlled programs at the Studio School Branch Campus such that the College will have an ongoing presence after the disassociation of Studio School.*
- *Prepare expansion plans for additional delivery locations in Nashville, and Denver in 2020.*

**Studio School Branch**
- *Monitor and effect compliance of the Studio School Branch with all policies and procedures, laws and regulations applicable thereto.*
- *Build a cooperative and mutually advantageous relationship with Studio School Education that supports a broader revenue opportunity for Hussian College.*

**Culture**
- *Build a culture of service, humility and transparency within the College.*
- *Build a clear understanding and commitment to the values of the College amongst all staff, faculty, and other service providers.*

**Strategic**
- *Prepare a plan for transition of the Daymar College name to Hussian College and begin implementation with the advice and consent of the Board of Directors.*
- *Operate strategically in a manner that is designed to avoid comprehensive intervention by accreditors and regulators.*

**Planning**
- *Maintain a comprehensive business plan for the College that addresses all goals, objectives and outcomes for all areas of operation of the College.*
- *Assign and monitor the achievement of KPIs for all staff and key faculty leaders awarding salary and other bonus opportunities based upon achievements.*

# EXHIBIT B

DocuSign Envelope ID: 70E20D17-99B3-4502-AE8C-972E20B21549



**AMERICAN ARBITRATION ASSOCIATION®**

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

To ensure your demand is processed promptly, please file online at www.adr.org/support. Complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.

## Parties (Claimant)

| | | |
|---|---|---|
| Name of Claimant: Steven Wojslaw | | |
| Address: 874 Silverwood Drive | | |
| City: West Chester | State: Pennsylvania | Zip Code: 19382 |
| Phone No.: (215) 495-6541 | Email Address: stevewojslaw@gmail.com | |
| Representative's Name (if known): Robert W. Small | | |
| Firm (if applicable): Reger Rizzo Darnall LLP | | |
| Representative's Address: The Cira Centre, Suite 1300, 2929 Arch Street | | |
| City: Philadelphia | State: Pennsylvania | Zip Code: 19104 |
| Phone No.: (215) 495-6541 | Email Address: Rsmall@regerlaw.com | |

## Parties (Respondent)

| | | |
|---|---|---|
| Name of Respondent: Hussian Collge, Inc., et al. See Attachment "A" for the name, contact information and counsel of additional Responde | | |
| Address: 1500 Spring Garden Street | | |
| City: Philadelphia | State: Pennsylvania | Zip Code: 19130 |
| Phone No.: (215) 574-9600 | Email Address: unkown | |
| Representative's Name (if known): John Mancebo, Esquire / Graeme E. Hogan, Esquire | | |
| Firm (if applicable): Kaufman Dolowich & Voluck | | |
| Representative's Address: 245 Main Street, Suite 330 / One Liberty Place, 1600 Market Street, Suite 4800 Philadelphia, PA 19103 | | |
| City: White Plains | State: New York | Zip Code: 10601 |
| Phone No.: (914) 868-0017/ (215) 501-7002 | Email Address: jmancebo@kdvlaw.com / ghogan@kdvlaw.com | |

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box   .

Claim: What was/is the employee/worker's annual wage range? ☐ Less than $100,000 ☑ $100,000-$250,000 ☐ Over $250,000
*Note: This question is required by California law.*

Amount of Claim: Damages are ongoing. As of the date of this filing they exceed $600,000.00

Claim involves: ☑ Statutorily Protected Rights ☑ Non-Statutorily Protected Rights

In detail, please describe the nature of each claim. You may attach additional pages if necessary:

Mr. Wojslaw formerly was employed by Hussian College as its Chief Financial Officer. The College failed and refuses to pay to Mr. Wojslaw wages and severance pay to which he is entitled and, along with its former President, engaged in fraud which injured Mr. Wojslaw. Additionally, at the College's request Mr. Wojslaw loaned to the College substantial amounts of money and incurred personal credit card debt for the College's benefit all of which the College failed and refuses to repay. The College and other Respondents are "Employers" as defined by the Pennsylvania Wage Payment and Collection Law, 43 Pa C.S. Sections 260.1 et seq., and their violation of that law entitles Mr. Wojslaw to liquidated damages and attorneys' fees. Mr. Wojslaw incorporates by reference Attachment to this form which further details



**AMERICAN ARBITRATION ASSOCIATION**®

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

Other Relief Sought: ☑ Attorneys Fees   ☑ Interest   ☑ Arbitration Costs   ☑ Punitive/ Exemplary
☑ Other: Liquidated damages and all relief available under the Pennsylvania Wage Payment and Collection Law and the common law of Per

---

Please describe the qualifications for arbitrator(s) to hear this dispute:

The arbitration agreement calls for three (3) arbitrators. Each should be a lawyer or retired judge with substantial experience in Pennsylvania employment and contract law and, especially, experience with the Pennsylvania Wage Payment and Collection Law. The Arbitrators' professional background should demonstrate an absence of bias in favor of or against either employees or employers.

---

Hearing: Estimated time needed for hearings overall:          hours  or  2                    days

---

Hearing Locale: The Philadelphia Court of Common Pleas has ordered that arbitration occur in Philadelphia, PA. [See Exhibit 1 to Attachmer

*(check one)* ☐ Requested by Claimant ☐ Locale provision included in the contract

---

Filing Fee requirement or $350 (max amount per AAA)

Filing by Company: ☐ $2,450 single arbitrator ☐ $3,050 three arbitrator panel

---

Notice: To begin proceedings, **please file online at www.adr.org/fileonline.** You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

---

Signature (may be signed by a representative):

*DocuSigned by:*
Robert W. Small
CD3171A61FATEEB

Date:
June 15, 2023

---

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Customer Service can be reached at 1-800-778-7879. Please visit our website at www.adr.org/support to file this case online.

# BEFORE THE AMERICAN ARBITRATION ASSOCIATION
## INTENATIONAL CENTRE FOR DISPUTE RESOLUTION
### Employment Dispute Arbitration Rules

**Steven Wojslaw,**
875 Silverwood Drive
West Chester, PA 19382
       Claimant

           **CASE NO.** 012300026838

*v.*

**Hussian College, Inc.**
1500 Spring Garden Street
Suite 101
Philadelphia, PA 19130

**David Figuli, Esquire**
8697 Blue Creek Road
Evergreen, CO 80439

**Joshua Figuli, Esquire**
19501 Redberry Drive,
Los Gatos, CA 95030

**Jeremiah Staropoli, PhD.**
1625 North Union Street
Wilmington, DE 19086
       Respondents

---

## ATTACHMENT TO CLAIMANT'S ARBITRATION DEMAND[1]

---

[1] The email address of Joshua Figuli, Esquire is believed to be Joshua.figuli@hussiancollege.edu. The email address of David Figuli, Esquire is believed to be dfiguli@figuligroup.net. Claimant does not have a current email address for Dr. Staropoli. The Messrs. Figuli are represented by Lee C. Durivage, Esquire of Marshall, Dennehey Warner Coleman & Goggin, P.C., 2000 Market Street, Suite 2300, Philadelphia, PA 19103. Mr. Durivage's email address is lcdurivage@mdwcg.com. Dr. Staropoli is represented by Christopher J. Gilligan, Esquire, Michael R. Miller, Esquire, and Abigail G. Guenther, Esquire, all of Margolis Edelstein, The Curtis Center, Suite 400 E, 170 S. Independence Mall W., Philadelphia, PA 19106-3337 Their telephone number is (215) 931-5879 Their respective email addresses are: cgilligan@margolisedelstein.com, mmiller@margolisedelstein.com and aguenther@margolisedelstein.com

1

# I. INTRODUCTION, *DRAMATIS PERSONAE* AND SUMMARY OF CLAIMS

1. This is a court ordered arbitration between an employee and his former employer pursuant to an employment offer letter ("Agreement") that calls for arbitration of matters arising under the Agreement or out of the employment relationship. [Exhibit 1 hereto] The Agreement calls for AAA arbitration before three (3) arbitrators; for that arbitration to be held in Nashville, Tennessee; and, pursuant to the laws of that state. Mr. Wojslaw filed suit against Respondents in the Philadelphia Court of Common Pleas at Docket No. 22-09-02465. Respondents raised the arbitration provisions of the Agreement through Preliminary Objections. Mr. Wojslaw asserted that the arbitration provision in the Agreement was unenforceable or unenforceable as written. The Court agreed with the latter argument. Following discovery and briefing on that issue, the court ordered that all of Mr. Wojslaw's claims be arbitrated but ordered that the arbitration be held in Philadelphia, Pennsylvania and pursuant to the laws of this Commonwealth. [Exhibits 2 and 3 hereto.]

2. Steven Wojslaw formerly was employed by Respondent, Hussian College, Inc. ("College") During that employment he was not paid all the wages he was owed and was not paid severance to which he was entitled when the College involuntarily terminated his employment without cause. Additionally, Mr. Wojslaw was not repaid substantial loans he made to the College at its request to address its cash flow shortfalls, interest on those loans, or amounts he placed on his personal credit cards for the benefit of the College and interest on those credit card charges.

3. All of the money owed to Mr. Wojslaw is "wages" as that term is defined by the Pennsylvania Wage Payment and Collection Act 43 Pa. C.S. §§ 260. 1 et seq. ("Wage Act") and he is entitled to the statutory remedies of that Act which include liquidated damages, attorneys' fees, and the costs of this arbitration and the pending lawsuit. Mr. Wojslaw's damages at the time of filing this Arbitration Demand, not counting attorneys' fees and daily interest running on both his loans to the College and the charges to his personal credit cards for the benefit of the College, exceed $543,000.00.

4. The individual Respondents are statutory "employers" under the Wage Act for which reason they are jointly and severally personally liable for Mr. Wojslaw's damages and statutory remedies.

5. Respondent, College is a Pennsylvania for-profit corporation operating in Philadelphia, Pennsylvania.

6. Respondent, Joshua Figuli, Esquire is, and at all relevant times was, an owner of the College and served as the Chairman of its Board of Directors, its President, Vice President, Secretary, and/or Treasurer. At all times, in all actions taken and failures or refusals to act by Joshua Figuli relevant to this matter, Joshua Figuli was a duly constituted agent of the College and engaged within the scope of that agency.

7. Respondent, David Figuli, Esquire is, and at all relevant times was an owner of the College and served as its President or Vice-President and corporate legal officer and as a director. At all times, in all actions taken and failures or refusals to act by David Figuli relevant to this matter, David Figuli was a duly constituted agent of the College and engaged within the scope of that agency.

8. Upon information and belief, the College has terminated involuntarily the employment of Respondent, Dr. Jeremiah Staropoli; however, at all material times, Dr. Staropoli, was the President and Chief Executive Officer of the College or its Vice President and was the representative of the College to whom Mr. Wojslaw directly reported. At all times and in all actions taken and failures or refusals to act by Dr. Staropoli relevant to this matter, he was a duly constituted agent of the College and engaged within the scope of that agency.

II. FACTS

9. On January 6, 2020, Mr. Wojslaw was employed by the College as its Vice President of Financial Operations. As a result of the quality of the performance of his duties in that position, effective July 30, 2020, Mr. Wojslaw was promoted by the Board of Directors of the College to the position of Chief Financial Officer. [See Exhibit 1]

10. Prior to accepting the College's initial offer of employment as its Vice President of Financial Operations, Mr. Wojslaw had worked for Dr. Staropoli at a prior place of common employment as a result of which Mr. Wojslaw placed special reliance in Dr. Staropoli to honestly represent the offers of employment he extended to Mr. Wojslaw on behalf of the College. At the time Mr. Wojslaw accepted initial employment with the College and at the time he accepted promotion, Mr. Wojslaw reasonably believed that the College was financially solvent and could

3

and would pay the salary and provide the other benefits of employment that he had been promised when the College offered, and he accepted those positions. This understanding came directly from Dr. Staropoli and the Figulis and was a material fact on which Mr. Wojslaw relied in accepting his promotion to Chief Financial Officer and such reliance was intended by the College, Dr. Staropoli and the Figulis to induce Mr. Wojslaw to accept employment and then continued employment with the College.

11. Pursuant to the Agreement, on July 30, 2020, Mr. Wojslaw was to receive an increase in his then current base salary to $200,000 per year until the first anniversary of his promotion to Chief Financial Officer when his base salary was to be further increased to $220,000 per year. The College failed and refused to increase Mr. Wojslaw's salary when and as called for by the Agreement. As a result, he was not paid the wages to which he was entitled by the Agreement.

12. Both as Vice President of Financial Operations and Chief Financial Officer, Mr. Wojslaw reported to Dr. Staropoli whom Mr. Wojslaw understood to be the President and Chief Executive of the College as that was how Dr. Staropoli referred to himself.

13. After his promotion to Chief Financial Officer of the College, Mr. Wojslaw continued to perform his duties diligently. At no time did Mr. Wojslaw receive either a formal or informal negative critique of his performance indicating any deficiency in the performance of his duties. To the contrary he received a bonus and promotion based on the performance of his duties as Vice President of Financial Operations.

14. In or about October 2021, approximately fifteen (15) months after Mr. Wojslaw's promotion to Chief Financial Officer, Dr. Staropoli approached Mr. Wojslaw and informed him that the College was unable to meet its financial obligations, including impending payroll obligations, and asked Mr. Wojslaw if he would loan money to the College to meet those obligations. As an inducement to Mr. Wojslaw doing so, Dr. Staropoli informed Mr. Wojslaw that it had been necessary in the past for the Figulis to loan money to the College from time to time and that when they did so it was upon the condition that the College repay those loans with ten percent (10%) *per annum* interest and there was "no reason that Mr. Wojslaw should not get in on that action," or words to that effect. When he made that statement, Dr. Staropoli was speaking as a duly constituted agent of the College and within the scope of his agency and Mr. Wojslaw

understood that to be the case and understood that if he loaned money to the College, it would be repaid with ten percent (10%) annual interest.

15. Based on Dr. Staropoli's statements and the prior relationship between Mr. Wojslaw and Dr. Staropoli, beginning in or about October 2021, Mr. Wojslaw orally agreed to and, in fact, made loans to the College which ultimately totaled $255,000. Although the College repaid those loans to Mr. Wojslaw it did not pay him the promised ten percent (10%) interest or, in fact, any interest whatsoever. The interest due on such loans as of the date of the filing of this Arbitration Demand is approximately **$4,434.00** but such unpaid interest continues to accrue at the rate of ten percent (10%) per year until paid. In addition, under the Wage Act, such interest constitutes "wages" and Mr. Wojslaw is entitled to liquidated damages on such unpaid interest in the approximate amount of **$1,110.00** as of the date of this Arbitration demand but which interest and liquidated damages increase daily until they are paid in full.

16. In approximately January 2022, Dr. Staropoli again asked Mr. Wojslaw if he again would loan money to the College on the same terms as the previous loans so that it could meet expenses, including upcoming payroll obligations. Believing that if he did so the College ultimately would pay the interest owed on the first series of loans and would repay the second set of loans together with ten percent (10%) interest on those loans, Mr. Wojslaw agreed to do so and, in fact, made another series of loans to the College which ultimately totaled **$209,642.42.** The College has failed and refused to repay those loans or interest on those loans to Mr. Wojslaw despite repeated demands that it does so. The approximate interest on those loans due to Mr. Wojslaw as of the date of this Arbitration Demand is **$26,774.43.** Under the Wage Act, such loans and interest are "wages" and Mr. Wojslaw is entitled to liquidated damages on that amount of the loans and unpaid interest totaling approximately **$60,272.00** but which amount increases with the passage of time.

17. In addition to making the two series of loans referred to above, because the College faced cash flow problems that prevented it from paying its obligations as they accrued, Mr. Wojslaw put expense obligations of the College on his personal credit card ultimately totaling **$32,745.48.** The items for which Mr. Wojslaw incurred those expenses on behalf of the College were necessary for the College to continue its recruitment of new students which was the "life blood" of the College as the College receives much of its income from federal grants the amount of which is based on student enrollment. Mr. Wojslaw charged such expense items to his personal credit card solely

because the College did not have the ability to pay those expenses as they came due and because not paying those expenses would severely damage the College. Dr. Staropoli was aware of each such occasion on which Mr. Wojslaw put College expenses on his personal credit card to benefit the College. Under the Wage Act, such amounts are "wages" and Mr. Wojslaw is entitled to liquidated damages on such charges which total **$8,186.37.**

18. Mr. Wojslaw has and continues to incur interest on the charges he made to his credit cards for the benefit of the College at annual rates as high as twenty-seven percent (27%). As of the filing of this Arbitration Demand, Mr. Wojslaw is owed interest on such charges in the approximate amount of **$17,500.00,** which amount increases with the passage of time. Under the Wage Act, such interest charged to Mr. Wojslaw constitutes "wages" and Mr. Wojslaw is entitled to liquidated damages on such interest charges in the approximate amount of **$4,375.00** which amount increases with the passage of time.

19. Although Mr. Wojslaw's base salary was to increase to $200,000 when he was promoted to Chief Financial Officer and to $220,000 on the one-year anniversary of that promotion, the College failed to increase his base salary timely to $200,000 and never increased it to $220,000 as a result of which Mr. Wojslaw incurred pay variances that total $26,042.49. Not until September 2022, (i.e., five months after the College had terminated his employment involuntarily) did Mr. Wojslaw receive direct deposits into his bank account from the College which appear to be payment of the aforementioned pay variances. Because those payments were not made timely, however, pursuant to the Wage Act Mr. Wojslaw is entitled to liquidated damages on the wages not paid timely in the amount of **$6,510.63**.

20. On April 25, 2022, Dr. Staropoli asked Mr. Wojslaw to join him for a meeting at a country club in Wilmington, Delaware. Dr. Staropoli did not inform Mr. Wojslaw of the meeting's purpose but Mr. Wojslaw assumed it was to discuss College matters.

21. When Mr. Wojslaw arrived at the meeting, Dr. Staropoli informed Mr. Wojslaw that his employment with the College was terminated effective immediately. Doctor Staropoli informed Mr. Wojslaw that the decision to terminate his employment was not made by him; that he had no problem with Mr. Wojslaw's performance of his duties but that it was the decision of the Board of Directors of the College. Dr. Staropoli informed Mr. Wojslaw that the reason for the termination of his employment was that the College's Board of Directors wanted to fill his position with

somebody more experienced in taking a private company public and not due to any inadequacy in the performance of his job by Mr. Wojslaw. Dr. Staropoli acknowledged that the College owed money to Mr. Wojslaw; assured him it would be paid; and suggested that Mr. Wojslaw prepare a promissory note for the College to sign for the amount owed plus interest. r. Staropoli also assured Mr. Wojslaw that he would receive a positive reference for future employers. Under the Agreement, Mr. Wojslaw was to receive a severance payment if his employment were terminated by the College without cause. Such severance consists of two (2) elements: three (3) months' "Regular Compensation" for each twelve (12) month period of continuous employment by the College to a maximum of twelve (12) months' Regular Compensation; and a pro-rated bonus "equivalent for such severance period." [See Exhibit 1]

22. Mr. Wojslaw's employment was terminated without cause as defined in the Agreement and, in any event, he never was given the ten (10) days' notice of any unsatisfactory performance and opportunity to cure same as required by paragraph 3 of the Agreement.

23. Mr. Wojslaw was entitled to six (6) months' severance pay for the two (2) twelve (12) month periods of continuous employment; i.e., from January 6, 2020, to January 5, 2021, and from January 6, 2021, to January 5, 2022, in the amount of $110,000 plus a prorated bonus for that six (6) month severance period in the amount of $27,500 or total severance of **$137, 500.00.** Such severance pay and bonus are "wages" under the Wage Act and under that Act, Mr. Wojslaw is entitled to liquidated damages on such amount totaling **$34,375.00.**

24. As of this Arbitration Demand, Mr. Wojslaw has incurred costs of **$ 6,851.00** in regard to his claims. Under the Wage Act, he is entitled to reimbursement from Respondents of those costs and any he incurs in connection with this Arbitration and confirmation proceedings following this Arbitration.

25. Accordingly, as of the date of this Arbitration Demand, Mr. Wojslaw is owed in excess of **$543, 000.00,** (excluding costs and attorneys' fees) which amount increases at a *per diam* rate based on the credit card interest Mr. Wojslaw continues to incur on the charges to his credit cards he made for the benefit of the College plus ten percent interest he was to receive on his loans to the College both of which are subject to application of the liquidated damage provisions of the Wage Act. Additionally, Mr. Wojslaw is entitled to reasonable attorneys' fees and any additional costs of this arbitration and the civil action.

26. Despite repeated demand, the College has failed and refuses to pay Mr. Wojslaw the money owed to him.

## FIRST CLAIM
### Violation of Pennsylvania Wage Payment and Collection Act
### 43 Pa. C.S. §§ 260. 1 et seq.
### Mr. Wojslaw *v.* All Respondents

27. Section 2.1 of the Wage Act, 43 Pa. C.S. § 260.2.1 defines "Wages" to include "Fringe Benefits" and defines "Fringe Benefits" to include "… separation pay …and *any* other amount to be paid to an employee pursuant to an agreement *or for the benefit of the employee*." (emphasis supplied) All of the items alleged as being owed to Mr. Wojslaw in the prior paragraphs of this Arbitration Demand are within the definitions of "separation pay," "fringe benefits," an "agreement" or "for the benefit of" Mr. Wojslaw and, therefore, within the definition of "Wages" under the Wage Act.

28. Section 2.1 of the Wage Act, 43 Pa C.S. § 260.1 defines "Employer" to include "…every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth *and any agent or officer* of any of the above-mentioned classes employing any person in this Commonwealth." (emphasis supplied)

29. The College and each of the individual Respondents are "employers" of Mr. Wojslaw as defined by the Wage Act.

30. Section 5 of the Wage Act, 43 Pa C.S. §260.5 provides that: "Whenever an employer separates an employee from the payroll, … the wages or compensation earned shall become due and payable *not later than the next regular payday of his employer on which such wages would otherwise be due and payable.*" (emphasis supplied)

31. The Respondents and each of them jointly and severally failed and refused to pay Mr. Wojslaw the wages due him as identified in the prior paragraphs of this Arbitration Demand on the next regular pay day of the College following termination of Mr. Wojslaw's employment and each of them continues to refuse and fail to pay to Mr. Wojslaw all wages due him in violation of the Wage Act.

32. Section 6 of the Wage Act 43 Pa C.S. §260.6 provides that in the case of a dispute over wages, the employer shall give written notice to the employee or his counsel of the amount of

wages which the employer concedes to be due and must pay such amount without condition *within the time set by the Wage Act.*

33. The Respondents jointly and severally violated the Wage Act by not providing to Mr. Wojslaw a statement of the wages admitted due to him and by failing to pay that amount unconditionally to him within the time set by the Wage Act.

34. In the absence of a good faith counterclaim or right of set-off, Section 10 of the Wage Act, 43 Pa. C.S. § 260.10 imposes a liquidated damages penalty in the greater amount of $500 or twenty-five percent (25%) of wages not timely paid.

35. Respondents have no good faith counterclaim or right of set-off.

36. Section 9.1 of the Wage Act, 43 Pa C.S. § 9.1 provides that an employee to whom wages are owed may institute an action under the Wage Act and the court in any action brought under the Wage Act *"shall,"* in addition to any judgment awarded to the plaintiff allow costs for reasonable attorneys' fees to be paid by the employer.

**WHEREFORE,** Mr. Wojslaw demands an award in his favor and against the Respondents, jointly and severally as follows:

1. Unpaid wages, as that term is defined in the Wage Act, in the amount of **$428,556.74**, adjusted upward to the date of award to account for the continued running of interest on the portion of the award representing interest owed on loans to the College and interest incurred by Mr. Wojslaw on credit card charges made for the benefit of the College.

2. Liquidated damages under the Wage Act in the amount of **$114,817.60** adjusted upward to the date of award to account for the continued running of interest on the portion of the award representing interest owed on loans to the College and interest paid on credit card charges made for the benefit of the College.

3. Costs under the Wage Act in the amount of **$6,851.00** or such greater amount of costs as are proven at the arbitration.

4. Reasonable attorneys' fees as determined by the arbitrators, to include attorneys' fees and cost Mr. Wojslaw will incur post arbitration in seeking confirmation of the arbitration award.

5. Post judgment interest on the award at the lawful rate of six percent (6%) until the date of payment, and

6. Such other remedies as the arbitrators find to be just and proper under the circumstances.

## SECOND CLAIM
**Breach of Contract**
(Alleged in the alternative to a portion of the First Claim)
**Mr. Wojslaw *v.* Hussian College**

37. At the time Mr. Wojslaw made the above-referenced loans to the College and incurred credit card debt on its behalf, the College promised to repay the loans with ten percent (10%) *per annum* interest and repay the credit card charges and interest incurred by Mr. Wojslaw on those charges.

38. The College has failed and refused to repay certain of the loans Mr. Wojslaw made to the College totaling **$209,642.42**; has failed and refused to pay the ten percent (10%) interest *per annum* the College, in the person of Dr. Staropoli, promised to pay on all of the loans; and has failed to reimburse Mr. Wojslaw for the credit card charges and interest on those charges he incurred on its behalf in the amount of **$40,931.85.**

**WHEREFORE,** Mr. Wojslaw demands an award in his favor and against the College as follows:

1. Repayment of the unpaid loans in the amount of **$209,642.00.**

2. Interest at the rate of ten percent (10%) per *annum* on the repaid loans from the respective date each repaid loan was made through the date of repayment of each such loan.

3. Interest at the rate of ten percent (10%) *per annum* on the unpaid interest on the loans that were repaid from the respective dates of repayment of such loans to the date of payment of such interest.

4. Interest at the rate of ten percent (10%) per *annum* from the respective dates of each loan to the College that the College has not repaid through the date of repayment of those loans.

5. Reimbursement of the credit card charges, and interest incurred thereon, by Mr. Wojslaw for the benefit of the College in the amount of **$40,931.85** adjusted upward to include continuing interest on such charges through the date of reimbursement by the College.

6. Post judgment interest on all of the foregoing damages at the legal rate of six percent (6%) per *annum* from the date of the Arbitrators' award through date of payment of the unpaid loans and interest on all of the loans and credit card charges.

7. Costs of suit and attorneys' fees as determined by the arbitrators to include attorneys' fees Mr. Wojslaw will incur post arbitration seeking confirmation of the arbitration award.

8. Such other remedies as the arbitrators find to be just and proper under the circumstances.

### THIRD CLAIM
#### *Quantum Meruit*
(Alleged in the alternative to a portion of the First and the Second Claims)
**Mr. Wojslaw *v.* Hussian College, David Figuli, Esquire and Joshua Figuli, Esquire**

39. The loans Mr. Wojslaw made to the College and the payment of expenses of the College that Mr. Wojslaw paid via his credit cards on behalf of the College were for the benefit of the College and David and Joshua Figuli who, because of the loans and credit card payments by Mr. Wojslaw, did not have to infuse the College with their own funds.

40. The payment of the College's expenses and the loans Mr. Wojslaw made to the College constitute benefits conferred by Mr. Wojslaw on the College and the Figulis.

41. The College and the Figulis appreciated such benefits and the College and the Figulis accepted and retained those benefits under circumstances that make it inequitable for them to retain those benefits without payment of value to Mr. Wojslaw.

**WHEREFORE,** Mr. Wojslaw demands an award in his favor and against the College, David Figuli and Joshua Figuli, jointly and severally as follows:

1. The amount of **$209,642.42** representing the unpaid loans.

2. Interest on the repaid loans at the rate of ten percent (10%) *per annum* from the respective dates such loans were made through the date they were repaid.

3. Interest at the rate of ten percent (10%) *per annum* on the unpaid interest on the loans that were repaid from the respective dates of repayment of such loans to the date of payment of such interest.

4. Interest on the unpaid loans at the rate of ten percent (10%) *per annum* from the respective dates such loans were made through the date of repayment.

5. Payment of **$32,745.48** representing expenses of the College Mr. Wojslaw paid via credit card charges.

6. Interest on the credit card charges to Mr. Wojslaw's personal credit cards made for the benefit of the College through the date of payment by Respondents.

7. Post judgment interest at the legal of six percent (6%) *per annum* on **$209,642.42** and the amounts referred to in paragraphs 2, 3, 4, 5, and 6 of this *ad damnum* clauses from the date of award until the date of payment of such amounts.

8. Reasonable attorneys' fees as determined by the arbitrators to include attorneys' fees Mr. Wojslaw will incur seeking confirmation of the arbitration award.

9. Such other remedies as the arbitrators find to be just and proper under the circumstances.

### FOURTH CLAIM
### Fraud (alleged in the alternative to portions of Count I and II)
### Mr. Wojslaw *v.* all Respondents

42. At each of the times Dr. Staropoli asked Mr. Wojslaw to loan money to the College, Dr. Staropoli, the Figulis and the College knew or, upon reasonable inquiry, would have known that the College would not pay to Mr. Wojslaw ten percent (10%) interest or any interest on those loans.

43. At each time Mr. Wojslaw put expenses of the College on his personal credit card the each of the Respondents knew or, upon reasonable inquiry, would have known that the College would not repay to Mr. Wojslaw the amounts of those charges and the interest Mr. Wojslaw incurred in respect of those charges.

44. The representations to Mr. Wojslaw that the College would pay ten percent (10%) interest *per annum* on the loans and the Respondents' silence as to the fact that the College would not

repay the credit card charges and interest incurred thereon were materially false statements or omissions of material fact and known by the Respondents to be material and false at the time made or the omissions occurred with the Respondents' knowledge or belief of their falsity and materiality and with the intention that Mr. Wojslaw rely thereon or be deceived by the omissions.

45.     At the time of the Respondents' misrepresentations and/or omissions the individual Respondents were acting as agents of the College and within the scope of that agency.

46. In making the loans, Mr. Wojslaw reasonably relied on Respondents' representations that the College would repay the loans and pay ten percent (10%) interest *per annum* on the loans.

47. In incurring the credit card charges, Mr. Wojslaw reasonably relied on Respondents' tacit representations that the College timely would reimburse him for those charges or he was deceived by the Respondents material omission of the fact that the College would not reimburse Mr. Wojslaw for such charges.

48. Mr. Wojslaw's reliance on the Respondents' representations and/or omissions of material fact about the loans being repaid with ten percent (10%) interest *per annum* on the loans and his reliance on the College to reimburse the charges to his credit cares for the benefit of the College was reasonable and justified under the circumstances.

49. Mr. Wojslaw reasonably relied on Respondents to his detriment in the amount of the unpaid loans, the credit card charges, the interest owed on the loans and the interest incurred on the credit card charges as identified in the prior paragraphs of this Arbitration Demand.

50. The College is liable in *respondeat superior* for the acts and omissions of the individual Respondents.

        **WHEREFORE,** Mr. Wojslaw demands an award in his favor and against all Respondents, jointly and severally as follows:

1.     The amount of **$209,642.42** representing the unpaid loans.

2.     Interest on the repaid loans at the rate of ten percent (10%) *per annum* from the respective dates of such loans that were repaid through the respective dates of repayment.

3.	Interest at the rate of ten percent (10%) *per annum* on the unpaid interest on the loans that were repaid from the respective dates of repayment of such loans to the date of payment of such interest.

4.	Interest on the unpaid loans at the rate of ten percent (10%) *per annum* from the respective dates of such loans through the respective dates of repayment of such loans.

5.	The amount of **$32,745.48** representing the credit card charges incurred by Mr. Wojslaw for the benefit of the College together with all interest Mr. Wojslaw has incurred on those charges through the date of payment by the Respondents.

6.	Post judgment interest at the legal of six percent (6%) *per annum* on the amounts referred to in paragraphs 1, 2, 3, 4, and 5 of this *ad damnum* clauses from the date of judgment until the date of payment.

7.	Punitive damages in an amount to be determined by the arbitrators.

8.	Reasonable costs and attorneys' fees as determined by the arbitrators.

9.	Such other remedies as the arbitrators find to be just and proper under the circumstances.

Respectfully submitted,

/s/ *Robert W. Small*
Robert W. Small
Attorney for Claimant

# EXHIBIT A

HUSSIAN COLLEGE, INC.

July 30, 2020

Steve Wojslaw

Dear Mr. Wojslaw:

Hussian College, Inc. (the "Company") is pleased to offer you employment with the Company on the terms described below.

1. **Position.** You will start in a full-time position as Chief Financial Officer and you will report to the President of the College, Jeremiah Staropoli, PhD, ("Superior") unless otherwise directed by your Superior or by the Board of Directors of the Company. A general description of your duties and responsibilities is attached at <u>Attachment A</u>. By signing this letter, you agree that as a condition of employment you will comply with all directives of your Superior and the Board of Directors and abide by all corporate and institutional policies and procedures applicable to you, as an employee, and applicable to your position. Further, you hereby represent and warrant to the Company that you are under no contractual or other legal obligations or restrictions that would prohibit, restrict or prevent you, in whole or in part, from performing your duties with the Company.

2. **Compensation**. Your base compensation for the faithful performance of the duties and responsibilities of the Position would be composed of Regular Compensation, Bonus Compensation and Benefits:

    a) Regular Compensation: You will be paid an annual initial base salary at the rate of Two Hundred Thousand Dollars ($200,000) per annum to be paid in equal installments in accordance with Company's common payroll practices and subject to legally mandated withholdings as well as those authorized by you from time to time or required due to your participation in the Benefits, but all as dependent upon the nature of the regulations, terms and conditions pertaining to the Benefits as established by the Benefit provider from time to time. Your compensation will increase to Two Hundred and Twenty Thousand Dollars ($220,000) on your 1 year anniversary date. as CFO.

    b) Bonus Compensation: You will be entitled to receive an annual bonus award of up to twenty-five percent (25%) of your Regular Compensation. The bonus award will be based upon an assessment of your achievement of performance goals during a measurement period all as set by the President of the College on a periodic basis. You will receive a $5000.00 signing bonus payable in January 2021.

    c) Benefits: You will be provided the following benefits, in addition to benefits automatically accruing to your Position in accordance with the policies of Company as established from time to time:

i.   Personal Leave – You will accrue personal leave at the rate of twenty (20) work days per year. For purposes of this provision a "year" will be measured on a calendar year basis and any partial year accrual will be prorated.

ii.   Pension – You are granted the right to participate in any pension and deferred compensation plans established by the College and applicable to your Position in accordance with the terms of each, if any.

3.   **Term and Termination.**  Your Position and employment with the Company may be terminated by the Company at any time with or without "Cause" and, in addition, you may resign at any time with or without "Good Reason." If you are terminated without Cause or if you resign with Good Reason during the term of your employment, you will receive a severance payment equal to three (3) months of Regular Compensation for each twelve (12) month period of continuous employment subject to a maximum accrued equivalent of twelve (12) months of Regular Compensation and a pro rata bonus equivalent for such severance period, all payable in accordance with the College's standard payroll practices.

"Good Reason" shall include (i) a serious illness that prevents you from performing the duties of your position that is expected to persist for more than six (6) consecutive months, (ii) the serious illness of your spouse that is terminal or has a significant, continuing deleterious impact on your ability to perform the duties of your Position, and (iii) the illness of a child that is life altering or terminal.

"Cause" means (a) theft, misappropriation or embezzlement of the assets or business opportunities of the Company, (b) conviction of a felony or other crime involving fraud or dishonesty or the entering of a guilty plea or plea of nolo contendere with respect thereto, (c) the commission of any act or omission involving material dishonesty or fraud with respect to the Company's customers or suppliers, (d) reporting to work under the influence of alcohol or illegal drugs, the use of illegal drugs (whether or not at the workplace) or other repeated conduct causing the Company or any of its affiliates substantial public disgrace, substantial disrepute or material economic harm; (e) substantial and repeated failure to perform essential duties of your Position as reasonably directed by the Company or its representatives which is not cured to the reasonable satisfaction of the Company within ten (10) days after written notice thereof is provided to you, (f) intentionally aiding or abetting a competitor, supplier or customer of Company with the intent of causing a  material disadvantage or material detriment of the Company, (g) gross negligence, willful misconduct or material breach of fiduciary duty with respect to Company, (g) an intentional or reckless misrepresentation to any of Company's regulatory, accrediting, or other oversight bodies, or (h) any material breach of the terms and conditions of this letter agreement which is not cured to the reasonable satisfaction of the Superior or the Board of Directors of the Company within ten (10) days after written notice issued to you.

Case ID: 220902465

4. **Release.** You acknowledge and agree that the severance payment provided for in Section 3 constitutes liquidated damages for any claim of breach of contract under this letter agreement as it relates to termination of your employment without Cause by Company or, by you, for Good Reason. Notwithstanding the foregoing, as a condition to receiving a severance payment available to you under this letter, you shall execute and agree to be bound by an agreement in form and substance reasonably satisfactory to Company (the "Release") relating to the waiver and general release of any and all claims arising out of or relating to your employment and termination of employment with the Company. Company shall have no obligation to make any applicable severance payments contemplated in this letter agreement if you fail to execute such a Release or seek to revoke such Release before it becomes effective. In addition, if you violate the terms of your Confidentiality, Noncompetition, Nonsolicitation and Invention Assignment Agreement identified and incorporated into this letter agreement in Section 5, hereof, the continuing obligations of Company to make any payments in furtherance of the severance payments identified in this letter agreement shall immediately terminate.

5. **Confidentiality, Noncompetition, Nonsolicitation and Invention Assignment Agreement.** Like all chief administrators of the College, you will be required, as a condition of your employment with the Company, to sign the Company's "Confidentiality, Noncompetition, Nonsolicitation and Invention Assignment Agreement", a copy of which is attached hereto and incorporated herein by this reference, enclosed standard Confidentiality, Noncompetition, Nonsolicitation and Invention Assignment Agreement.

6. **Outside Activities.** While you render services to the Company, you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the Company. In addition, while you render services to the Company, you will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company nor will you convert business opportunities of the Company of any of its affiliates to your advantage or that of any other person or entity.

7. **Entire Agreement and Governing Law.** This letter supersedes and replaces any prior or contemporaneous understandings or agreements, whether oral, written or implied, between you and the Company regarding the matters described in this letter agreement. This letter agreement will be interpreted in accordance with the laws of the State of Tennessee a without giving effect to provisions governing the choice of law.

8. **Dispute Resolution.** Any disputes arising out of this document or the relationship established hereunder or hereby not otherwise resolved by the parties shall be subject to final and binding arbitration under the arbitration rules of the American Arbitration Association before a panel composed of three (3) arbitrators. The venue for all arbitral proceedings would be Nashville, Tennessee. Such arbitration process shall be the exclusive means for resolving all disputes between the parties unless otherwise directed or prohibited by law.

9. **Counterparts.** This letter agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Execution of a facsimile or scanned image will have the same force

Case ID: 220902465

and effect as execution of an original, and a facsimile signature or scanned image will be deemed an original and valid signature.

*[Signature Page Follows]*

Case ID: 220902465

If you wish to accept this offer, please sign and date both the enclosed duplicate original of this letter agreement and the enclosed Confidential Information and Invention Assignment Agreement and return them to me. As required by law, your employment with the Company is also contingent upon your providing legal proof of your identity and authorization to work in the United States. In addition, the Company reserves the right to conduct background investigations and/or reference checks on all of its potential employees.

We look forward to your favorable reply and to working with you at Hussian College, Inc.!

Very truly yours,

HUSSIAN COLLEGE, INC.

Jeremiah Staropoli,
President of the College

ACCEPTED AND AGREED:

Steve Wojslaw

(Signature)

7/30/2020

Date

Enclosure:

Attachment A: Position Description
Attachment B: Confidential Information and Invention Assignment Agreement

Case ID: 220902465

# EXHIBIT B

STEVEN WOJSLAW

Plaintiff,

v.

HUSSIAN COLLEGE, INC., *et al.*

Defendants.

**COURT OF COMMON PLEAS
PHILADELPHIA COUNTY
PENNSYLVANIA**

Docket No.: 22-09-02465

## ORDER GRANTING HUSSIAN COLLEGE INC.'S PETITION TO COMPEL ARBITRATION

AND NOW, this 29th day of MARCH, 2022, upon consideration of petitioner/defendant, HUSSIAN COLLEGE, INC.'s ("**Hussian College**") Petition to Compel Arbitration (the "**Arbitration Petition**") and plaintiff, Steven Wojslaw's ("**Plaintiff**" or "**Wojslaw**") opposition thereto, and argument by counsel, if any, it hereby **ORDERED** and **DECREED** that:

1.  The Petition is **GRANTED**;

2.  Plaintiff is hereby **COMPELLED** to submit all claims against all defendants pending in the above-captioned action to arbitration pursuant to the terms of the Employment Agreement (*see* Complaint Exhibit A); and

3.  All proceedings in this Court against all defendants are **STAYED**, pending the resolution of Plaintiff's claims in such arbitration.

BY THE COURT:

_____ J.

220902465-Wojslaw Vs Hussain College, Inc. Etal

EXHIBIT C

| STEVEN WOJSLAW | COURT OF COMMON PLEAS |
|---|---|
| Plaintiff, | PHILADELPHIA COUNTY |
| v. | PENNSYLVANIA |
| HUSSIAN COLLEGE, INC., et al. | Docket No.: 22-09-02465 |
| Defendants. | |

## ORDER AMENDING ORDER OF MARCH 29, 2023

AND NOW, this 28th day of April, 2023, upon consideration of Plaintiff's Motion for Reconsideration of this Court's Order of March 29, 2023 and any opposition thereto by defendants and good cause therefor appearing it is hereby **ORDERED** that such Motion is **GRANTED**. It is **FURTHER OREDERED** that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

*ABOVE CAPTIONED MATTER SHALL UNDERGO ARBITRATION IN PHILADELPHIA, PENNSYLVANIA UNDER THE LAWS OF THIS COMMONWEALTH*

BY THE COURT:

_____ J.

220902465-Wojslaw Vs Hussain College, Inc. Etal

22090246500122

**STEVEN WOJSLAW,**

   **Claimant,**


   **and**                                        Case No. 01-23-0002-6838


**HUSSIAN COLLEGE, INC., DAVID FIGULI, ESQ.,**

**JOSHUA FIGULI, ESQ. and JEREMIAH STAROPOLI, PhD,**

   **Respondents.**

---

## INTERIM AWARD

   **WE, THE UNDERSIGNED PANEL OF ARBITRATORS**, having been designated in

accordance with the executed "July 30, 2020 Letter from Jeremiah Staropoli to Steven Wojslaw"

("Agreement") entered into by the above-named parties, and having been duly sworn and having

duly heard the proofs and allegations of the parties, and Claimant Steven Wojslaw ("Wojslaw")

represented by Robert W. Small, Esq. of Reger Rizzo & Darnall LLP, Respondent Hussian

College, Inc. (the "College") represented by Charles Bergin, Esq. and Karen L. Wagner, Esq. of

Kaufman Dolowich LLP, Respondents David Figuli, Esq. and Joshua Figuli, Esq. (collectively

the "Figulis") represented by Lee C. Durivage, Esq. of Marshall Dennehey Warner Coleman &

Googin, P.C., and Respondent Jeremiah Staropoli, Ph.D. ("Staropoli") represented by Abigail

Gunther, Esq. of Margolis Edelstein (collectively "Respondents"), hereby **INTERIM AWARD**,

as follows:

## I.    BACKGROUND

   This dispute stems from Wojslaw's employment with the College, a since shuttered for-

profit institution of higher learning. Wojslaw was originally hired by the College as its Vice President of Financial Operations in early 2020. In this position he reported to Staropoli, the President and Chief Executive Officer of the College. Staropoli reported to the College's Board of Directors ("Board") which included its owners – the Figulis.

In July of 2020, Wojslaw was promoted to Chief Financial Officer ("CFO") of the College. This promotion was memorialized in the July 30, 2020 Agreement outlining the terms of Wojslaw's employment as CFO.

The College began to experience severe financial difficulties. As a result, according to Wojslaw, he was approached by Staropoli in the fall of 2021 and was invited to "get in on [the] action" by "loaning" money to the College so that it could meet certain financial obligations. Based on this communication with Staropoli, Wojslaw provided funds to the College through a series of contributions totaling approximately $255,000.00 between October 2021 and the end of the year ("First Tranche"). Wojslaw claims he was to receive interest from the College on the First Tranche. None of the terms of this arrangement were memorialized in any way, whether through a formal agreement or any contemporaneous written communications between the parties. While the principal of $255,000.00 was repaid to Wojslaw prior to the end of 2021, he never received any additional interest or return on this transaction.

In early 2022, Wojslaw made another series of similar transfers to the College totaling $209,642.42 ("Second Tranche"). While the parties dispute whether the Second Tranche was made at the request of Staropoli, they do not dispute that the College received these funds from Wojslaw. As with the First Tranche, the terms of this transaction were not memorialized in a formal agreement or otherwise recorded through contemporaneous communications between the parties. However, unlike the First Tranche, Wojslaw was not repaid any amount, not even the

2

principal, on the Second Tranche.

In addition to these transactions, Wojslaw alleges that he used personal credit cards to pay certain College expenses to assist during times when the school was experiencing cashflow issues. According to Wojslaw, he paid nearly $33,000.00 for such expenses between the end of 2021 and the Spring of 2022 at the behest of Staropoli.

On approximately April 25, 2022, Staropoli called Wojslaw to a meeting and informed him that his employment with the College was terminated effective immediately. Following his termination, there were various communications between the parties concerning Wojslaw's claim for monies he alleged were owed by Respondents. With the exception of a Fall 2022 direct deposit by the College in the gross pre-tax amount of approximately $26,000.00, Wojslaw has not received any of the funds he claims are owed by Respondents.

Wojslaw originally sued Respondents in the Court of Common Pleas for Philadelphia County in September 2022. In March 2023, Claimant's case was compelled to arbitration in accordance with the "Dispute Resolution Provision" of the Agreement.

On June 15, 2023, Wojslaw filed a demand for arbitration with the American Arbitration Association ("AAA") alleging that Respondents failed to pay him certain monies surrounding his employment as the CFO of the College. Specifically, Wojslaw alleged that Respondents failed to:

- Pay him the principal and interest on the Second Tranche;

- Pay him interest on the First Tranche;

- Reimburse him for the College's expenses he paid on personal credit cards;

- Reimburse him for finance fees charged on unpaid credit card balances for the unreimbursed expenses he incurred for the College;

- Pay him severance under the Agreement;

- Pay him liquidated damages on a wage payment issued months after his termination; and

- Pay him $17,178.00 for unpaid bonuses.

According to Wojslaw, Respondents violated the Pennsylvania Wage Payment and Collection Law ("PWPCL"), 43 Pa. Stat. Ann. §§ 260.1 *et seq.,* by failing to make the above payments, and by making payment late for the increase in salary he was supposed to have received upon promotion to CFO under the Agreement. Each of these claims, according to Wojslaw, trigger the PWPCL's liquidated damages and fee shifting provisions. *See* Pa. Stat. Ann. § 260.10; *id.* at § 260.9a. In the alternative, Wojslaw asserts common law claims of breach of contract, *quantum meruit*, and fraud against certain Respondents for most of the monies he alleges he is entitled to under the PWPCL.

The undersigned Panel held a hearing on Wojslaw's claims on April 24, 25, and 26, 2024. The parties have since submitted extensive post-trial briefing. Based on the evidence presented at the hearing and the parties' briefs, the Panel rules as follows:

## II.  WOJSLAW'S CLAIMS

### A.  Unpaid Principal and Interest on the Second Tranche

Wojslaw seeks to recover unpaid principal on the $209,642.42 Second Tranche plus the alleged agreed-to interest and liquidated damages under the PWPCL. His PWPCL and alternative fraud claims are asserted against all Respondents. Wojslaw's alternative common law claim for breach of contract is asserted against only the College, while his *quantum meruit* claim is asserted against the Figulis and the College.

### 1.  The Second Tranche is Not Recoverable "Wages" Under the PWPCL.

The PWPCL provides "a vehicle for employees to enforce payment of their wages and compensation withheld by their employers." *Oberneder v. Link Comput. Corp.*, 674 A.2d 720,

4

721 (Pa. Super 1996). The statute defines recoverable wages to include "all earnings of an employe[e], regardless of whether determined on time, task, piece, commission or other method of calculation." 43 Pa. Stat. Ann. § 260.2a. This definition "also includes fringe benefits or wage supplements whether payable by the employer from his funds or from amounts withheld from the employe[e]s' pay by the employer." *Id.* "Fringe benefits or wage supplements" is defined to include:

> [A]ll monetary employer payments to provide benefits under any employe benefit plan, as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.; as well as separation, vacation, holiday, or guaranteed pay; reimbursement for expenses; union dues withheld from the employes' pay by the employer; *and any other amount to be paid pursuant to an agreement to the employe[e], a third party or fund for the benefit of employe[e]s.*

*Id.* (emphasis supplied).

According to Wojslaw, the Second Tranche is recoverable wages because it satisfies the catchall portion of the PWPCL's "fringe benefit or wage supplement" definition highlighted above. The Panel disagrees.

The parties concur that, in order to assert a PWPCL claim, Wojslaw must possess a contractual right to wages from his employer(s) that were not paid. *See Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 954 (Pa. Super. 2011). Such a binding entitlement can be based on "an implied oral contract between the employee and employer." *Id.* (citing *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003)).

Wojslaw failed to prove the existence of a contract as to the Second Tranche. The alleged oral agreement between Wojslaw and Staropoli concerning the Second Tranche is unsupported by a written contract or any contemporaneous communications between the parties regarding any terms of this purported loan. Moreover, the existence of such an agreement is belied by Staropoli's testimony that he did not request this contribution from Wojslaw in the first place.

*See* N.T. Apr. 24, 2024 at 54. The Panel credits Staropoli's testimony over that of Wojslaw (who stood to benefit) on this issue.

Moreover, even if an enforceable oral contract existed regarding the Second Tranche, this transaction does not fit within the "fringe benefit or wage supplement" definition's catchall provision because the amount alleged to be paid here was not "for the benefit" of "employe[e]*s*." Unlike a stock option or similar plan that is open to multiple "employee*s*" of an employer, the Second Tranche was an individual transaction solely for the benefit of a single "employee" – Wojslaw. Wojslaw did not point to any authority supporting the notion that fully documented personal loans from a corporate officer to a company in general (let alone an undocumented financial arrangement such as the Second Tranche here) fits within this definition. Thus, the Panel holds that the unpaid principal and any purported agreed-to interest on this transaction are not recoverable "wages" under the PWPCL.

> 2. *Wojslaw Failed to Demonstrate the Breach of a Contract with the College regarding the Second Tranche.*

In the alternative, Wojslaw alleges that the College breached its oral agreement to repay the principal plus interest on the Second Tranche. Under Pennsylvania law, a plaintiff alleging a breach of contract action must demonstrate: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) resulting damages. *Braun*, 24 A.3d at 954. "While every element must be pleaded specifically, it is axiomatic that a contract may be manifested orally, in writing, or as an inference from the acts and conduct of the parties." *Id.*

The Panel finds that Wojslaw failed to carry his burden of demonstrating that there was a meeting of the minds between him and the College (or an agent thereof) that the Second Tranche was a loan to be repaid with interest. Wojslaw testified that Staropoli asked him to make the Second Tranche, *see* N.T. Apr. 24, 2024 at 220, but Staropoli disputes this testimony, *see* N.T.

Apr. 24, 2024 at 54. As stated above, the Panel credits Staropoli's testimony. Absent an executed promissory note or other contemporaneous communications between the parties indicating that the transfer of the principal was made in a manner consistent with a loan agreement, Wojslaw has failed to satisfy his burden of demonstrating an enforceable contract with the College to treat the Second Tranche as a loan with mandatory interest payments.[1]

      3.     *The College Unjustly Benefitted from the $209,642.42 Principal of the Second Tranche.*

Wojslaw also asserts in the alternative a Pennsylvania common law claim of *quantum meruit* against the College and the Figulis regarding the Second Tranche. The elements for such a claim are: (1) a benefit conferred on defendant by plaintiff; (2) appreciation of such benefit by defendant; and (3) acceptance and retention of such benefit under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *See Shafer Elec. & Const. v. Mantia*, 96 A.3d 989, 993 (Pa. 2014).

Here, there is no dispute that the funds underlying the Second Tranche were transferred to the College by Wojslaw, or that these funds were utilized by the College as part of its ongoing operations for the College's benefit. *See* N.T. Apr. 25, 2024 at 295. The parties also agree the $209,642.42 Second Tranche has not been repaid to Wojslaw in the intervening years. For these reasons, the Panel holds that it was inequitable for the College to have retained the $209,642.42 principal.

With regard to Wojslaw's claim for interest on the Second Tranche, as discussed above, Wojslaw failed to satisfy his burden of demonstrating that there was an enforceable contract to treat the Second Tranche as a loan to be repaid with interest. *See* Section II.A.2 *supra*. Thus, the

---

[1] The expectation of receiving interest on the Second Tranche is further belied by the fact that Wojslaw did not receive it on the First Tranche.

College has not unjustly retained the benefit of the purportedly agreed-to interest on the Second Tranche under this claim.

However, Wojslaw has failed to satisfy his burden of demonstrating that the Figulis (either in their individual capacities or in their official capacities as owners and Board members of the College) knew of the transfer of the Second Tranche funds,[2] or appreciated the benefit of the $209,642.42 principal payment from the Second Tranche through equity payments and/or withdrawals of money from the College. For these reasons, the Panel finds against Wojslaw and in favor of the Figulis on his *quantum meruit* claim regarding the Second Tranche.

Based on the above, the Panel finds for Wojslaw and against the College in the amount of $209,642.42 plus pre-judgment interest calculated at simple 6% rate[3] from the dates of each fund transfer to today, which totals $31,143.84.

### 4.    *Wojslaw has Failed to Satisfy the Elements of Common Law Fraud.*

Wojslaw asserts that the Respondents committed fraud by inducing the transfer of funds as part of the Second Tranche. The elements of common law fraud under Pennsylvania law are: (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result of the misrepresentation. *See Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. 90, 108-109, 464 A.2d. 1243, 1252 (Pa. Super. 1983).

The parties do not dispute that Wojslaw made monetary transfers to the College totaling $209,642.42. *See* N.T. Apr. 25, 2024 at 295. Staropoli specifically denies that he asked Wojslaw

---

[2] Wojslaw specially testified that he did not discuss the Second Tranche with either of the Figulis. *See* N.T. Apr. 24, 2024 at 337-344.

[3] The legal rate of interest in Pennsylvania is 6%. 41 Pa. Stat. Ann. § 202.

to make Second Tranche in the first place, *see* N.T. Apr. 24, 2024 at 54, and Wojslaw testified

that he did not discuss making either the First or Second Tranche with either of the Figulis, *see*

N.T. Apr. 24, 2024 at 337-344. Thus, Wojslaw has failed to satisfy his burden of demonstrating

that Respondents have made any misrepresentations (intentionally, recklessly or otherwise)

regarding the purported loan and/or the terms of any purported repayment.[4]

### B.    Unpaid Interest on the First Tranche

Wojslaw also seeks to recover the purported unpaid agreed-to interest on the $255,000.00

First Tranche as well as liquidated damages under the PWPCL. As with the Second Tranche, his

PWPCL and alternative fraud claims concerning the First Tranche are asserted against all

Respondents. Likewise, Wojslaw's alternative common law claim for breach of contract is

asserted against only the College, while his *quantum meruit* claim is asserted against the Figulis

and the College.

> 1.    *Interest on the First Tranche is Not Recoverable "Wages" Under the*
>       *PWPCL.*

As discussed in Section II.A.1 *supra*, the Panel holds that undocumented purported loan

agreements between an individual corporate officer and a company does not fit within the

PWPCL's definition of recoverable wages. Thus, the Panel finds against Wojslaw and in favor of

Respondents on his PWPCL claim seeking interest on the First Tranche.

> 2.    *There was no Meeting of the Minds Between Wojslaw and the College as*
>       *to the Interest on the First Tranche.*

To prevail on his common law breach of contract claim regarding purported unpaid

interest on the First Tranche, Wojslaw was required to demonstrate a binding contract as to what

---

[4] Moreover, Wojslaw's fraud claims are barred by the gist of the action doctrine, which bars tort
claims, including fraud claims, that arise from a contract between the parties. *See eToll Inc. v.
Elias/Savion Advtg.*, 811 A.2d 10, 19 (Pa. Super. 2002).

that return would be. The parties agree there was no executed promissory note regarding the First Tranche or contemporaneous written communications regarding its terms.

Wojslaw did not have the "loan" booked in an interest-bearing account. *See* N.T. Apr. 25, 2024 at 214-18. And, as to the interest rate, Wojslaw failed to prove there was a meeting of the minds. He did not even have a clear understanding in his *own* mind. *See* N.T. Apr. 25, 2024 at 191-196; Apr. 24, 2024 at 331-333 (10% "flat" or "simple" interest versus 20% flat interest versus 5% annually paid each quarter). Wojslaw failed to clearly articulate what the agreed-to interest was supposed to be. If a CFO or other financial professional such as Wojslaw cannot have a meeting in his own mind of the interest rate, he could not have reached an enforceable accord with the College.

### 3. The Failure to Pay Interest on the First Tranche did not Confer an Inequitable Benefit on the College and the Figulis.

For Wojslaw to prevail on his *quantum meruit* claim he must demonstrate that it was inequitable for the College and/or Figulis to have accepted and retained the benefit of not paying the agreed-to interest on the First Tranche. *See Shafer*, 96 A.3d at 993. Several factors weigh against such a finding.

First, as discussed in Section II.B.2 *supra*, Wojslaw has failed to articulate what the agreed-to rate was. Absent such confirmation, it is impossible for the Panel to determine whether retention of such interest was inequitable.

Second, the principal on the First Tranche was repaid in December 2021, approximately two months after the first of the series of transfers was made in October 2021. *See* N.T. Apr. 24, 2024 at 229-231. While it is true that the College had use of these funds during those sixty days, this relatively short period and negligible comparison to its overall operating budget of approximately $24 million. *See* N.T. Apr. 24, 2024 at 195. This negates any unjust benefit the

College may have received. Moreover, as with the Second Tranche, Wojslaw failed to demonstrate that the Figulis (either in their individual or official capacities as owners and board members of the College) personally appreciated the benefit of not paying interest on the First Tranche through equity payments and/or withdrawals of money from the College.

Finally, the Panel is troubled by the notion that a corporate officer, board member or owner can make a short-term loan to its employer or other entity to which it owes a fiduciary duty with the expectation of high rates of return, and then claim the failure to pay such rates is inequitable. The propriety of such an arrangement, especially at institutions of higher education that receive substantial funds from the federal government, is questionable at best.

4. *Wojslaw has Failed to Demonstrate that the Respondents Committed Fraud by Failing to Pay Interest on the First Tranche.*

Finally, Wojslaw seeks to hold the Respondents liable for failing to pay interest on the First Tranche under common law fraud. As with his fraud claim concerning the Second Tranche, Wojslaw has failed to satisfy his burden here as well.

Wojslaw testified that he did not discuss making either the First or Second Tranche with the Figulis prior to (or after) transferring the funds to the College. *See* N.T. Apr. 24, 2024 at 337-344. This admission, in addition to the lack of any evidence regarding any misrepresentations by the Figulis, precludes a finding of fraud on either of their parts.

Wojslaw's fraud claims against Staropoli and the College are also fatally flawed. As discussed in Section II.B.2 *supra*, Wojslaw is unable to articulate what interest on the First Tranche that he expected to receive from the College. It is true that Wojslaw and Staropoli each testified that they expected the College to pay some rate of interest to Wojslaw. *See* N.T. Apr. 25, 2024 at 191-196, Apr. 24, 2024 at 37-38, 207, 331-333. Staropoli even testified that he understood the interest on the First Tranche had been paid back. *See* N.T. Apr. 24, 2024 at 53-54.

11

However, Wojslaw failed to cite any misrepresentations of fact uttered by Staropoli or anyone else at the College that induced Wojslaw to make the First Tranche in the first place. Moreover, as discussed in Section II.B.3 *supra*, the Panel does not believe that Wojslaw, as an officer of the College, was damaged by not receiving an excessive rate of interest on the First Tranche when the principal was paid back in full only two months later. Thus, we find against Wojslaw and in favor of Respondents on his claim of fraud concerning the unpaid interest on the First Tranche.

### C. Unreimbursed Expenses on Behalf of the College

At the request of Staropoli, Wojslaw made purchases on his personal credit cards for the College totaling $32,745.48. Wojslaw submitted three expense reports that were not reimbursed. One, dated September 30, 2021, totaled $19,386.10 for advertising and software. Another, dated April 25, 2022, totaled $10,859.38 for consulting and expenses related to a graduation ceremony in California. The third totaled $2,500.00 for additional expenses related to the California graduation ceremony. The record is unclear as to when Wojslaw submitted the first expense report. He submitted the latter two after his termination in April 2022. These expenses remain unpaid.

The PWPCL protects payment of "fringe benefits," which includes "reimbursement for expenses." 43 Pa. Stat. Ann. § 260.2a. "Every employer" is required to pay wages and fringe benefits timely. *Id.* at § 260.3. The statute imposes liability on "employer[s]" *id.* at § 260.2a, which it defines as "every person, firm, partnership, association, corporation, receiver, or other officer of a court of this Commonwealth and any agent or officer of any of the above classes employing any person in this Commonwealth."

Wojslaw seeks to hold all Respondents liable for these alleged violations. Clearly, the College was Wojslaw's employer. Accordingly, the college was required to reimburse Wojslaw for expenses he incurred, and its failure to do so violated the act.

The statute does not impose liability on individuals merely because they may be, for example, a board member or owner of the employing entity. *See Mohney v. McClure,* 568 A.2d 682 (Pa. Super. 1990). As the Chief Executive Officer of the College and Wojslaw's direct supervisor, Staropoli authorized the expenses, knew about them, and could have ensured their payment. He played an active role in the failure to pay Wojslaw's expenses. He was, then, an "employer" within the meaning of the act and is liable under it for the unreimbursed expenses.[5] *See Britton v. Whittmanhart, Inc.,* 2009 U.S. Dist. LEXIS 54584, *8 (E.D. Pa. June 25, 2009).

The Figulis, on the other hand, were not involved in payment of employee expenses, nor were they aware of Wojslaw's expense reports at any relevant time. They did not have sufficient involvement to incur liability as "employers." *See id.*; *Mohney, supra.* Thus, the Figulis are not liable for Wojslaw's expenses under the PWPCL.[6]

We find, then, that Wojslaw is entitled to recover his unreimbursed expenses from the College and Staropoli in the amount of $32,745.48.

In addition to unpaid wages, the PWPCL provides:

> Where wages remain unpaid for thirty days beyond the regularly scheduled payday, … and no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employe shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater.

43 Pa. Stat. Ann. § 260.10.

---

[5] The panel was informed at the hearing that Wojslaw had settled his claims against Staropoli for $25,000.00. The Panel ordered that the settlement agreement be produced to the other Respondents. No party introduced the settlement agreement into evidence. The Panel, therefore, has no information whether the settlement released some or all Wojslaw's claims against Staropoli. In any event, Staropoli remains a party in this action.

[6] Arbitrator Santillo respectfully dissents from the Panel's holding that Joshua Figuli was not an "employer" of Wojslaw under the PWPCL.

There was no good faith basis for the College and Staropoli to withhold payment of Wojslaw's expenses. Accordingly, he is entitled to liquidated damages of $8,186.37 (25% of $32,745.48). His expense claim plus liquidated damages equals $40,931.85. Prejudgment interest on that amount, at the legal rate of 6% simple, from May 25, 2022 (30 days after Wojslaw's termination to today) is $5,470.29. Thus, the total awarded for his claim for expenses is $46,402.14. This amount must then be reduced by the $25,000.00 Wojslaw received in settlement from Staropoli. Wojslaw is then entitled to recover $21,402.14 for his unreimbursed expenses claim.

In the alternative, Wojslaw asserts claims against the Figulis for common law *quantum meruit* and fraud. There was no evidence that the Figulis personally enjoyed any benefit from the expenses Wojslaw paid on behalf of the College. Likewise, there was no evidence of any misrepresentation by the Figulis, an essential element of fraud, *see Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994), as to his expense reimbursement claim.[7]

Therefore, we find against Wojslaw and in favor of the Figulis on his *quantum meruit* and fraud claims regarding his unreimbursed expenses by the College.

### D. Unreimbursed Interest on Personal Credit Cards Used for Expenses on behalf of the College

Wojslaw seeks recovery of $1,995.08 for interest he incurred on his personal credit cards after he charged College expenses on those cards, plus PWPCL liquidated damages on that amount under the PWPCL. The interest he seeks was charged to him at annual rates of 27.74% and 29%.

Wojslaw's testimony about the amount of interest he incurred was confusing and failed to

---

[7] Since the Panel finds against Wojslaw on is common law fraud claim, it will not reach the issue of punitive damages.

satisfy his burden of demonstrating that the interest charges resulted from the College's failure to reimburse him. Indeed, he acknowledged in his testimony that he "screwed up" his calculations regarding this claim. *See* N.T. Apr. 25, 2024 at 108, 117. Further, while the College was bound to reimburse him for expenses incurred on its behalf, it never agreed to pay him for the high interest rates imposed by his credit card companies.

We have already awarded Wojslaw pre-judgment interest on the unreimbursed expenses. *See* Section II.C *supra*. As to those expenses, he is entitled to no more.

### E.    Unpaid Severance Payments under the Agreement.

Wojslaw seeks severance pay in the amount of $144,666.67 plus liquidated damages of 25% in the amount of $36,666.67 under the PWPCL, for a total of $183,333.34. He asserts his severance pay claim against all Respondents.

The PWPCL does not create any independent rights to compensation – instead it merely provides additional remedies for an employer's failure to pay compensation it agreed to pay. Therefore, the Agreement governs his claim to severance pay. It provides in relevant part:

> **3. Term and Termination** . . . If you are terminated without Cause or if you resign with Good Reason during the term of your employment, you will receive a severance payment . . ..

> **4. Release** . . . [A]s a condition to receiving a severance payment available to you under this letter, you shall execute and agree to be bound by an agreement in form and substance reasonably satisfactory to the Company (the "Release") relating to the waiver and general release of any and all claims arising out of or relating to your employment and termination of employment with the Company. Company shall have no obligation to make any applicable severance payments contemplated in this letter agreement if you fail to execute such a Release or seek to revoke such Release before it becomes effective.

Agreement (Ex. J-2) at 2-3. Wojslaw argues that, if severance pay qualifies as a "wage" under the PWPCL, then there is an unconditional duty to pay it. He is correct that severance pay *could* be considered "wages" protected under the PWPCL – but he ignores the other critical part of the

inquiry: was there an agreement to pay those "wages"? The answer to that question is "no" because a release of all claims was an express pre-condition to receiving the severance under the Agreement.

It is well-established that employers may make severance pay contingent on employees releasing their legal claims. *See, e.g., Junguzza v. Gemalto, Inc.*, 2014 WL 3887753, *5 (E.D. Pa.); *see also Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 521 (3d Cir. 1988) (holding that, to be enforceable, a release must be knowing and voluntary). Not surprisingly, Wojslaw does not provide any support for his bold assertion to the contrary that "the Act does not permit the conditioning of the payment of wages on the employee releasing claims against his employer." Claimant's Post-Arbitration Brief at p. 12.

Wojslaw relies on the College's failure to tender him a release agreement to execute in accordance with paragraph 4 of the Agreement. This argument assumes Wojslaw *would have* signed such a release had it been presented to him. The scope of Wojslaw's claims in this arbitration negates that assumption. As discussed in Section II *supra*, Wojslaw brought claims for various types of compensation above and beyond his severance pay claim. By bringing additional claims that would have been extinguished by a release of "any and all claims arising out of or relating to your employment and termination" under paragraph 4 of the Agreement, he disavowed the purpose of the release and relinquished his right to severance.

For these reasons, as to Wojslaw's severance pay claim, the Panel finds against Wojslaw and in favor of Respondents.[8]

---

[8] Respondents also contend Wojslaw is not entitled to severance under the Agreement because his discharge was "for cause." Given that the Panel holds Wojslaw is not entitled to severance because he never entered a release and instead brought claims "arising out of or relating to [his] employment," it need not address whether or not his termination was for cause.

## F.    Liquidated Damages on the Delayed Payment of Wages

After his termination, Wojslaw retained counsel to pursue various amounts for unpaid compensation allegedly due and owing. Approximately five months after Wojslaw's termination, the College issued a payment in the gross amount of approximately $26,000 and treated that payment as wages (it was reported on a W-2 form and wage deductions were taken). Wojslaw seeks 25% in liquidated damages under the PWPCL against all Respondents because this post-discharge payment was untimely.

The premise of Wojslaw's claim to liquidated damages on the $26,000 payment is that he had been underpaid while employed as CFO of the College and was entitled to that amount. The Panel concludes that premise is wrong.

The College presented convincing evidence that Wojslaw was not underpaid and, to the contrary, he was paid more than he was due under his Agreement. Stephen Solomon, a forensic accountant with Deloitte and expert in financial analysis, examined Wojslaw's ADP payroll records showing the gross wages and bonuses Wojslaw received for the relevant time period (from July 2020 when he was promoted to CFO through the end of 2022), his gross wage statements, and his 2021 tax return, as well as the compensation section of the Agreement. N.T. Apr. 25 2024 at 262-263, 265. Solomon explained that, under the Agreement, Wojslaw was entitled to receive a total of $387,758. *Id.* at 270. Yet the College actually paid him $451,730, meaning the College overpaid Wojslaw by $63,972. *Id.* at 270-271, 281-287, 307-308. In arriving at this conclusion, Solomon accounted for the fact that Wojslaw deferred some of his pay, and for the $26,000 Wojslaw was paid after his termination. *Id.* at 308, 350-351.

Wojslaw did not refute this testimony. In post-hearing briefing, his counsel presented his own math based on his own assumptions. This does not constitute evidence, and does not undermine the uncontroverted testimony of an experienced forensic accountant.

For these reasons, as to Wojslaw's claim for liquidated damages on the College's post-termination wage payment, the Panel finds against Claimant and in favor of Respondents.

**G.      Bonus Claim**

Claimant also seeks $17,178.08 for bonuses he alleges were due him under the Agreement. The Agreement provides for bonus compensation "based upon an assessment of your achievement of performance goals . . . set by the President . . .." Claimant did not present any evidence that performance goals were set, let alone met. Accordingly, he failed to meet his burden to establish any entitlement to bonus payments.[9]

## III.      CONCLUSION

**WHEREFORE, IT IS HEREBY ORDERED** this 16th day of August 2024, for the reasons above and other good cause shown that:

1.      Wojslaw is awarded a total of $240,786.26 ($209,642.42 plus $31,143.84 in pre-judgment interest) against Hussian College under the Pennsylvania doctrine of *quantum meruit* for the unpaid principal of the Second Tranche;

2.      Wojslaw is awarded a total of $21,402.14 ($32,745.48 in unreimbursed expenses *plus* liquidated damages of $8,186.37 *plus* $5,470.29 in pre-judgment interest *minus* $25,000.00 paid as part of the settlement with Wojslaw) against Jeremiah Staropoli and Hussian College under PWPCL for the unreimbursed expenses he paid on behalf of the College; and

3.      Wojslaw may submit a petition for reasonable attorney's fees related to his prevailing claim under the PWPCL in paragraph 2 *supra* for reimbursement of expenses pursuant to 43 Pa. Stat. Ann. § 260.9a(f) on or before August 30, 2024. Staropoli and the College shall

---

[9] In any event, the overpayment more than compensates Wojslaw for the allegedly unpaid bonus amount.

submit any opposition thereto on or before September 13, 2024, and Wojslaw shall submit any reply on or before September 20, 2024. The parties shall append copies of any authorities to their submissions concerning any legal propositions that are known or likely to be disputed, and all briefs and authorities provided shall be submitted in pdf searchable format if possible.

This Award shall remain in full force and effect until such time as a Final Award is rendered.


R. ANDREW SANTILLO
Chair of Arbitration Panel

CAROLE KATZ
Member of Arbitration Panel

ELLIOT B. PLATT
Member of Arbitration Panel



Northeast Case Management Center
Heather Santo
Vice President
1301 Atwood Avenue
Johnston, RI 02919
Telephone: (866)293-4053
Fax: (866)644-0234

November 8, 2024

Robert W. Small
Reger Rizzo Darnall, LLP
2929 Arch Street
Circa Centre, 13th Floor
Philadelphia, PA 19104-2899
**Via Email to: rsmall@regerlaw.com**

John Mancebo, Esq.
Kaufman Dolowich
245 Main Street, Suite 330
White Plains, NY 10601
**Via Email to: jmancebo@kdvlaw.com**

Lee C. Durivage, Esq.
Dennehey Warner Coleman & Goggin, P.C.,
2000 Market Street, Suite 2300
Philadelphia, PA 19103
**Via Email to: lcdurivage@mdwcg.com**

Christopher Gilligan, Esq.
Margolis Edelstein
170 South Independence Mall West
The Curtis Center, Suite 400E
Philadelphia, PA 19107
**Via Email to: Cgilligan@margolisedelstein.com**

Case Number: 01-23-0002-6838

Steven Wojslaw -vs- Hussian College, Inc. -vs- David Figuli, Esq. & Joshua Figuli, Esq. -vs- Jeremiah Staropoli, PhD

Dear Parties:

By direction of the Arbitrator's we herewith transmit to you the duly executed Final Award in the above matter.

We appreciate the opportunity to assist you in resolving your dispute. As always, please do not hesitate to contact me if you have any questions.

Sincerely,

*Katie Rourke on behalf of*

Rebecca Regniere
Manager of ADR Services
Direct Dial: (401)431-4848
Email: RebeccaRegniere@adr.org

cc:
Graeme E. Hogan, Esq.
Charles B. Bergin, Esq.
Alexandra O. Freeman, Esq.
Karen L. Wagner, Esq.
Michael R. Miller, Esq.
Abigail Guenther, Esq.

R. Andrew Santillo, Esq.
Elliot B. Platt, Esq.
Carole Katz, Esq.

U.S.M.S.
X-RAY

RECD JAN 10 2025

ORIGIN ID:LNRA    (561) 318-6004
JEREMIAH STAROPOLI
7776 ESPRESSO MAIL
7776 ESPRESSO BLVD

WEST PALM BEACH FL 33411
UNITED STATES US

TO CLERK OFFICE
UNITED STATES DISTRICT COURT
601 MARKET ST
RM 2609
PHILADELPHIA PA 19106

SHIP DATE: 08JAN25
ACTWGT: 0.74 LB
CAD: 106202739/WSXI3700
DIMS: 10X8X0 IN

BILL SENDER

INV:
PO:
REF: 0165003
DEPT:

FedEx Express

E

THU - 09 JAN 12:00P
PRIORITY OVERNIGHT

19106
PA-US PHL

TRK# 2841 5776 9907

XS REDA

Part # 156297-435 ARDB2 EXP:10/25

498 6 A
10.30 900
RT 499 0110

A 9907
10.30 01.10
498 6
RT 499
FZ 499